# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-1112

STATE OF LOUISIANA

VERSUS

DENNA L. DECUIR

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 2009-CR-50493
HONORABLE EDWARD BROUSSARD, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Marc T. Amy, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**Roger P. Hamilton, Jr.**
**Assistant District Attorney**
**Fifteenth Judicial District**
**Post Office Box 175**
**Abbeville, LA 70511**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**J. Clay LeJeune**
**Attorney at Law**
**Post Office Box 1919**
**Crowley, LA 70527**
**(337) 788-1505**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Denna Decuir**

PETERS, J.

The defendant, Denna Decuir, appeals the thirty-five year sentence imposed for her conviction of the offense of manslaughter, a violation of La.R.S. 14:31. For the following reasons, we affirm the sentence in all respects but remand the matter to the trial court with instructions to inform the defendant of the appropriate time limitation for applying for post-conviction relief pursuant to La.Code Crim.P. art. 930.8.

The facts giving rise to this prosecution are not in dispute. On January 21, 2009, the defendant waited until her husband, Milton Decuir, fell asleep and then shot him in the head seven times. On February 10, 2009, a grand jury indicted her for the offense of second degree murder, a violation of La.R.S. 14:30.1. Thereafter, on January 11, 2010, the defendant entered into a plea agreement with the State of Louisiana (state) wherein she agreed to plead guilty to the reduced charge of manslaughter. The defendant entered this plea without any promise of a particular sentence.

After the completion of a June 4, 2010 sentencing hearing, the trial court sentenced the defendant to serve thirty-five years at hard labor. Thereafter, the defendant filed a motion for reconsideration of the sentence, which the trial court denied. When the trial court denied a subsequently filed motion for new trial, the defendant perfected this appeal. In her appeal, she raises five assignments of error:

1. The trial court erred in failing to particularize the sentence and comply with La.Code Crim.P. art. 894.1.

2. The trial court erred in imposing a sentence which was excessive considering the factual circumstances and history of abuse between the appellant and the victim in this matter.

3. The trial court erred in failing to allow the defendant to present additional witnesses at the sentencing hearing.

4. The trial court erred in failing to grant a new trial to allow the evaluation and production of a witness who could have evaluated

the defendant's mental condition at the time of the commission of the offense. The record reflects that the court failed to allow her to be examined by a psychological expert to determine her mental state at the time of commission of the crime and to establish the effect and mitigating circumstances which the pattern of abuse suffered by her had on her mental competency.

5. The trial court erred in limiting the defendant to two years from the date of the sentence to make a claim for post conviction relief where the time limitation should have run from two years from the date that the sentence became final.

### *Assignment of Error Number One*

In complaining that the trial court erred in failing to particularize her sentence, the defendant's basic argument is that the trial court sentenced her as if she had committed premeditated murder rather than manslaughter. She asserts that the trial court did so by failing to set forth a sufficient factual basis for her sentence and failing to give adequate consideration to the guidelines set forth in La.Code Crim.P. art. 894.1.

Louisiana Code of Criminal Procedure Article 894.1 contains a series of factors to be considered by the trial court in sentencing a defendant. In considering these sentencing guidelines, the trial court must "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." La.Code Crim.P. art. 894.1(C). However, to comply with La.Code Crim.P. art. 894.1(C), the trial court "need not articulate every circumstance or read through a checklist of items." *State v. Anderson*, 95-1688, p. 4 (La.App. 3 Cir. 5/8/96), 677 So.2d 480, 483. Still, the record should establish that the trial court adequately considered the codal guidelines in particularizing a defendant's sentence. *Id.* That is to say, "the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1." *State v. Ellis*, 42,520, p. 23 (La.App. 2 Cir. 9/26/07), 966 So.2d 139, 152,

2

*writ denied*, 07-2190 (La. 4/4/08), 978 So.2d 325.

> The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. *State v. Smith*, 433 So.2d 688 (La.1983); *State v. Dallas*, 36,397 (La.App. 2d Cir. 11/6/02), 830 So.2d 1113. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. *State v. Jones*, 398 So.2d 1049 (La.1981); *State v. Strange*, 28,466 (La.App.2d Cir. 6/26/96); *State v. Hudgins*, [519 So.2d 400 (La.App. 2d Cir. 1988), *writ denied*, 521 So.2d 1143 (1988)].

*State v. Scott*, 36,763, p. 3 (La.App. 2 Cir. 1/29/03), 836 So.2d 1180, 1182.

However, "[t]here is no requirement that specific matters be given any particular weight at sentencing." *Ellis*, 966 So.2d at 153.

> Despite the mandates of La.Code Crim.P. art. 894.1, our courts have held that:

> [F]ailure to comply with article 894.1 does not automatically render a sentence invalid. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary, even where there has not been full compliance with La.C.Cr.P. art. 894.1. *State v. Delaughter*, 29,974 (La.App.2d Cir.12/10/97), 703 So.2d 1364, *writ denied*, 98-0018 (La.5/1/98), ---So.2d ----, 1998 WL 234691. The question is whether the record presented is sufficient to demonstrate that the trial court did not abuse its discretion. *State v. Davis*, 448 So.2d 645 (La.1984).

*State v. Smith*, 34,325, p. 2 (La.App. 2 Cir. 12/20/00), 775 So.2d 640, 642.

Sentences also will not be overturned for failure to comply with statutory guidelines where the sentencing court implicitly considered the factors set forth in La.Code Crim.P. art. 894.1. *State v. Thibodeaux*, 502 So.2d 296, 298 (La.App. 3 Cir.), *writ denied*, 505 So.2d 1140 (La.1987).

At the June 4, 2010 sentencing hearing, the trial court heard the testimony of a number of witnesses, including the defendant. The evidence presented at that hearing describes an extended marital relationship that, in the best light, can only be

3

described as dysfunctional—and in the worst light, as violent beyond imagination.

The defendant testified that beginning six months after her 1984 marriage to the victim, he began abusing her. The first instance occurred when he came home from work intoxicated, threw her to the ground, and began kicking and hitting her. At the time, she was pregnant with their first child, Kasha,[1] and she claims she used a metal trash can to shield her stomach from the blows inflicted by her husband. Things did not get any better in the marriage after this rocky start. The defendant described incident after incident of domestic violence toward her, ending in the shooting incident of January 21, 2009. These included threats and physical violence by her husband that occurred at their home, at the home of others, and at her various workplaces.[2] Often these incidents involved the use of a weapon by her husband. Just some of the examples testified to by the defendant included a time when her husband set fire to all of her clothes, including her work uniforms, in the backyard; and times when he locked her outside of her home in the winter.[3] Almost all of these altercations involved the victim's abuse of alcohol.

Seldom were law enforcement personnel called to respond to the incidents of violence, but when called the general result was that they restored order and no one pressed charges. When arrests were made, the charges were often dropped. The defendant's explanation was that when she pressed charges or sought restraining orders, her husband threatened her and she would dismiss everything out of fear.

---

[1]The defendant had a child, Falon Langlinais, by a previous relationship. After she married the victim, he adopted the child as his own.

[2]The defendant testified that these encounters often involved the children as well as family members of both the defendant and her husband. Additionally, she testified to the loss of a number of jobs because of the victim's interference with her employment relationships.

[3]She claims that on one occasion the victim pushed her outside naked and locked the door.

In 1987, the defendant became pregnant again, but claims she suffered a miscarriage after a physical attack by her husband. Not long thereafter, she became pregnant again and subsequently gave birth to her daughter, Shena. According to the defendant, she continued to work through her marriage despite the continuing violence and dysfunctional relationship.

The catalyst which began the final spiral downward seems to have occured in 2007 when Shena gave birth. Soon after the child's birth, Shena and the baby moved into her parents' home. During that same time, the defendant took employment in Mississippi and was gone from the home most of the time, but was constantly in contact with her daughter. According to the defendant, her husband's violent propensities then turned to Shena and the child.

In 2008, the defendant began employment in Texas, but nothing changed on the home front. She testified that at 7:00 a.m. on January 21, 2009, she telephoned her Louisiana home to speak to Shena. However, she spoke to her husband instead and was informed that Shena was still asleep. According to the defendant, the victim sounded as if he had already been drinking. She telephoned a number of times that morning because she wanted to remind Shena that the child had an appointment that should not be missed. Shena and her father then became involved in an altercation that apparently arose over the telephone conversations. The victim then telephoned the defendant and threatened Shena, and the defendant responded by telling Shena to pack some clothes and leave.

The defendant received a telephone call from her husband at approximately 6:00 p.m. that same day. According to the defendant, her husband was still angry over the altercation of that morning, threatened Shena, and asked for money.

5

Concerned with Shena's safety, the defendant immediately drove from Texas to her Vermilion Parish home.

According to the defendant, her husband was standing by his truck when she drove up to their home. He then went inside, returned with his rifle, and threatened her. Both the defendant and the victim ultimately went into the house, where the threats and complaints from the victim continued. The defendant testified that while inside the house, her husband held the rifle to her nose, threatened to break her neck, and told her that he was going to "spit down [her] throat like [her] guts were on fire." He ultimately set the rifle down and retreated to the bedroom, still cursing and threatening everyone. The defendant testified that, at this point, her mind went blank and she remembers nothing that happened thereafter—not even her return trip to Texas that evening.

Detective Kim Verrett of the Vermilion Parish Sheriff's Office testified at the request of the defendant and presented a consistent history of complaints against the victim for violent behavior beginning in 1999.[4] Of the thirteen documented complaints between 1999 and January of 2009, some involved direct altercations between the defendant and her husband, but others were nothing more than fearful expressions by the defendant of what her husband might do.

Sami Riley, who is the executive director of Chez Hope Center, a family violence crisis center in Franklin, Louisiana, also testified at the request of the defendant. In counseling with the defendant, Ms. Riley instructed her to write every incident she could remember on index cards . According to Ms. Riley, this exercise produced seventy such cards. Her evaluation of the events described on the cards,

---

[4]Detective Verrett testified that he was aware complaints had been filed before 1999, but he had no documents to support the particulars of those complaints.

together with her independent research into the available police reports and court filings, caused Ms. Riley to conclude that the defendant's situation was one of severe domestic violence with "red flag factors" common to all fatal domestic abuse cases.

She testified that her research indicated that the defendant left her husband at least nine times during the marriage, but only filed divorce pleadings once and always reconciled with him. According to Ms. Riley, physical separation periods are the most dangerous times for an abused spouse and are usually when fatalities occur. In Ms. Riley's opinion, women have been taught that it is their responsibility "to fix the marriages, to fix the problems, take care of the family, [and] take care of the children," and that the average battered woman leaves the relationship approximately seven times. Additionally, the average battered woman does not necessarily want their abuser to go to jail—she simply wants someone to make him stop abusing her.

Finally, Falon Decuir Uriegas, the defendant's oldest daughter, testified at the sentencing hearing on behalf of her mother. Her initial recollection of the marriage relationship between her mother and adopted father supported the continuing turmoil testified to by her mother.

Despite this picture of a one-sided violent relationship painted by the defendant, other evidence reflected a different family situation. The defendant acknowledged that in 1990 she had shot her husband during one of the altercations. She explained that her husband had gone to bed that evening in a very intoxicated condition and, when she tried to wake him for dinner, he grabbed her by the hair and pulled her around the bedroom. He then locked her outside and, when Falon unlocked the door for her, she was met by her husband, who was armed with a rifle. As the altercation continued, her husband ultimately put down the rifle. She grabbed

7

the weapon and pointed it at her husband, and, when he attempted to take it away from her, it discharged, wounding him. Law enforcement personnel questioned her concerning the incident, but charges were never filed against her. On another occasion, law enforcement personnel arrested the defendant for slapping her husband during an argument.

The record also reflects that, on one occasion, the victim filed a petition to terminate the marital relationship and, in that petition, alleged as grounds for relief that the defendant had violently assaulted him. Specifically, he alleged that the defendant had physically scratched him to the extent that she had scarred his face; that she obsessed over money; and that she constantly criticized and taunted him, suggesting she could find someone better to care for her.

The defendant does not deny shooting her husband and does not deny disposing of the weapon used to shoot him. However, she maintains that she has no memory of the shooting or the events thereafter and does not know the location of the murder weapon. She acknowledges that shooting her husband was wrong and that she knew the difference between right and wrong at the time she shot her husband.

Shena had actually been the first to testify in the sentencing hearing, and expressed her feeling of deep loss for her father. Initially, she vaguely asserted that her mother's actions were intentional and certainly not in self defense. After listening to the other testimony, she requested permission to again address the trial court, and the trial court granted her request. When she addressed the trial court this second time, she questioned her mother's version of the events of January 21, 2009,[5]

---

[5]Specifically, Shena questioned why her father would be waiting with a weapon for her mother when he was not supposed to know she was coming; why her mother was worried about her [Shena] when her mother was the one who told her to leave; and why her mother followed her father into the house if he was armed with a weapon—especially given the history of violence her mother

8

mentioned other instances wherein her mother was the aggressor,[6] and took her sisters to task for not testifying that there were two sides to the marriage problems. Shena suggested that her mother was manipulative and "evil," and that the tears she shed in court were not tears of despair as she would have the trial court to believe.

When questioned further by the trial court concerning Shena's statement, Kasha acknowledged the family problems were mutual. Concerning a particular incident testified to by Shena involving a shovel handle,[7] Kasha acknowledged that she saw her mother walk into the living room and hit her father over the head with the handle. According to both Shena and Kasha, their father sustained a severe cut on his head as a result of the attack. Kasha also acknowledged that she had heard her mother threaten her father often, and that her mother would often tell her husband that "I can put a bullet in your head right now."

Upon completion of the testimony and argument of counsel, the trial court stated the following in sentencing the defendant:

> First of all, Ms. Decuir, you were given a tremendous break by the District Attorney by reducing the charge from second degree murder, where you would have served a life sentence without benefit if convicted of that, to manslaughter and then punting this matter to me.
>
> You claim you were abused, but it was obvious from things that I've heard and things that I've read, that the abuse went both ways. You shot him on more than one occasion. You were arrested for domestic violence. This wasn't your first brush with the law.
>
> Either of you, yourself or Mr. Decuir, could have easily removed yourself from this situation at any time. When you were in Mississippi, you said he didn't know where you were. He could have never found you. You could have stayed there. And you said, "Yes, but he calls

---

had testified to.

[6]Shena spoke of numerous times when she heard her mother threaten her father and verbally abuse him.

[7]Kasha thought it was a broomstick handle rather than a shovel handle.

me." Well, get a different phone number.

Some of your own children want to see you appropriately punished.

Mr. Decuir asked you on several occasions to borrow money for his alleged drug habit[,] and you refused to give it to him. But he didn't beat you up on those occasions. You didn't testify to that nor did anyone. That doesn't show me that you were afraid of him in any way.

This was a deliberate premeditated murder. You drove hours from Texas over here all the time with the intent to commit murder. Then you drove back after the murder, woke up the next morning and went to work like nothing happened. You showed no remorse except today in the courtroom for the first time.

You tried to cover up or lie about the crime when you were first interviewed by the sheriff's office when you found out that they had records that you were - - proved you to be lying and you finally confessed. But if they wouldn't have had that, you'd still be saying, "I didn't do it."

The maximum sentence you can receive - - another thing I'd like to point out. Shena allegedly spit on him one time. But there were no allegations that he did anything to her physically.

You were aware of the battered women's shelters. You knew there were places to go. The defendant had filed for separation on one occasion alleging domestic violence on your part.

The maximum sentence is forty (40) years for manslaughter. However, I'm going to take into account that the District Attorney thought it appropriate to reduce the charge. I'm assuming they did it for a good reason.

I'm also going to take into account the number of people that testified on your behalf and wrote letters on your behalf asking for leniency. The most leniency, however, that I can see that I can give you with a good conscience, is five (5) years of leniency, which means that I hereby sentence you to thirty-five (35) years at hard labor.

Immediately before the trial court pronounced sentence and gave its reasons for the sentence imposed, both the prosecutor and the defense counsel were given an opportunity to summarize their individual positions concerning the sentencing process. The very first thing the prosecutor did was to refer to La.Code Crim.P. art.

10

894.1 and suggest to the trial court that the defendant was in need of correctional treatment which could best be provided by a hard labor sentence, and that any lesser sentence would deprecate the seriousness of the offense. La.Code Crim.P. art. 894.1(A). Additionally, all those factors suggested in *Scott*, 836 So.2d 1180 (personal history, prior criminal record, serious of the offense, and the likelihood of rehabilitation), were before the trial court and either expressly or implicitly considered.

Considering the extensive record created at the sentencing hearing and the trial court's reasons for imposing the thirty-five year sentence, we conclude that there is an adequate basis for this court to review whether or not the penalty imposed constituted an abuse of the sentencing court's discretion. Therefore, we find no merit in this assignment of error.

### Assignment of Error Number Two

In this assignment of error, the defendant asserts that the trial court imposed an excessive sentence "considering the factual circumstances and history of abuse between the appellant and the victim." Specifically, she asserts that she is a forty-four-year-old mother who has supported her family through a life of abuse; that this is her first felony offense; and that the trial court failed to give adequate weight to the mitigating circumstances in this case. Therefore, she asserts, "[t]he thirty-five year sentence is nothing more than a needless imposition of pain and suffering as it makes no measurable contribution to acceptable goals of punishment."

The law is well settled concerning the standard to be used in reviewing excessive sentence claims:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive

sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

The maximum incarceration sentence that may be imposed on someone convicted of having committed manslaughter is forty years at hard labor. La.R.S. 14:31(B). That being the case, the defendant's thirty-five-year sentence falls within the statutory sentencing range. However, even when a sentence falls within the statutory sentencing range, it still may be unconstitutionally excessive, and in determining whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has suggested that several factors may be considered:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*,

12

03-562 (La. 5/30/03), 845 So.2d 1061.

Still, "the trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

A decision on point with the matter now before us is *State v. Russell*, 42,479 (La.App. 2 Cir. 9/26/07), 966 So.2d 154, *writ denied*, 07-2069 (La. 3/7/08), 977 So.2d 897. In that case, the defendant shot his stepfather twice in the head after an argument. The argument began when the defendant confronted his stepfather about his suspicions that the stepfather had been inappropriate with one of the defendant's children, and the defendant claimed the shooting was in self-defense because his stepfather had been approaching him with a machete at the time the defendant shot him. After the shooting, the defendant concealed his actions by burying the victim's body, by tidying the site, by burning the victim's personal effects, and by lying about his stepfather's whereabouts. The defendant was convicted of manslaughter and sentenced to forty years at hard labor.

The defendant in *Russell* asserted on appeal that his sentence was excessive. Finding that the trial court had considered the violent nature of the offense, the defendant's deliberate creation of the risk of death or great bodily harm, the use of a dangerous weapon, the permanent injury to the victim, the pattern of the bullets (two in the head with one being a contact shot), and the defendant's attempts to conceal the evidence, the second circuit affirmed the sentence imposed.[8] Noting that the

---

[8]In affirming the sentence, the second circuit further explained that the sentencing court's remarks indicated it felt the jury had been greatly lenient in finding the defendant guilty of manslaughter instead of second degree murder.

13

penalty for second degree murder was life imprisonment, the second circuit found no abuse of the trial court's sentencing discretion.

As in *Russell*, the trial court in the instant case clearly stated that this was a case of premeditated murder rather than manslaughter. The record supports the trial court's conclusion; it reflects a history of mutual physical abuse between the defendant and her husband, including a prior instance when the defendant shot her husband and another previous incident when the defendant attacked him in his sleep. Moreover, the record also reflects that the defendant frequently threatened to shoot her husband in the head. Additionally, by entering into the plea agreement the defendant reduced her sentencing exposure from life imprisonment to forty years.

Because we conclude thirty-five years at hard labor in the instant case does not constitute an abuse of discretion and is neither shocking nor fails to make a meaningful contribution to acceptable penal goals, we reject this assignment of error.

### Assignment of Error Number Three

In this assignment of error, the defendant asserts that the trial court erred in not allowing her to call additional witnesses at the sentencing hearing. Specifically, she asserts she was denied the right to present expert testimony concerning the psychological impact caused by years of domestic abuse. However, this issue did not arise at the sentencing hearing but was first mentioned in her motion to reconsider sentence. As previously stated, the trial court rejected that motion. We find no eror in the trial court's ruling.

> No full scale evidentiary hearing is required at sentencing in a non capital case. *State v. Bosworth*, 360 So.2d 173 (La.1978). However, a sentencing must be conducted in open court [La.C.Cr.P. Art. 871] and in compliance with La.C.Cr.P. Art. 894.1. Upon proper request and appropriate allegation in order to avoid an

14

> excessive sentence improperly resulting from materially
> false information, a defendant is entitled to an opportunity
> to deny or explain prejudicial or derogatory information
> made available to the sentencing judge. *State v. Trahan*,
> 367 So.2d 752 (La.1978). *See also State v. Telsee,* 388
> So.2d 747 (La.1980).

*State v. Collinsworth*, 452 So.2d 285, 287-88 (La.App. 2 Cir. 1984) (alteration in original).

The record establishes, and the defendant does not dispute, the fact that she was not deprived of an opportunity to rebut false and prejudicial information at the sentencing hearing. She testified extensively at that hearing and presented the testimony of Ms. Riley and others in support of her claims. The defendant did not request that the record be reopened for additional testimony until after sentencing, and does not assert that, prior to sentencing, she was unaware such information would be relevant. Furthermore, on appeal the defense cites no statute, custom, or jurisprudence in support of her position.

We find this assignment of error to be without merit.

### *Assignment of Error Number Four*

In this assignment of error, the defendant contends the trial court erred in denying her motion for new trial. Specifically, she asserts that were a new trial granted, she would have the opportunity to be evaluated by a psychological expert who could then provide an opinion as to her mental condition at the time of the offense.[9]

The defendant bases her request for a new trial on La.Code Crim.P. art. 851(3), which provides that the trial court "shall grant a new trial whenever:"

---

[9]In her motion before the trial court, the defendant also asserted in the alternative that she wanted the opportunity "to present additional evidence which was not or could not have been presented at [the] sentencing hearing." We have already disposed of this issue.

> New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty[.]

With regard to the content of a defendant's motion for new trial based on newly discovered evidence, La.Code Crim.P. art. 854 provides:

> A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
>
> (1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
>
> (2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
>
> (3) The facts which the witnesses or evidence will establish; and
>
> (4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
>
> The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.

The defendant's motion for new trial did not comply with La.Code Crim.P. art. 854 as it did not contain any of the necessary information listed therein.

Because the defendant failed to allege an adequate basis for a new trial in her motion for new trial, the trial court did not abuse its discretion in denying the motion. Furthermore, the time to file a motion seeking withdrawal of a guilty plea is prior to sentencing. La.Code Crim.P. art. 559. We find no merit in this assignment of error.

*Assignment of Error Number Five*

In her final assignment of error, the defendant asserts that the trial court erred in limiting her to two years from the date she was sentenced in which to file claims for post-conviction relief. In its brief to this court, the state agrees with the

16

defendant's position on this point.

The prescriptive period for filing for post-conviction relief is two years from the date a defendant's conviction becomes final under the provisions of La.Code Crim.P. arts. 914 and 922, not two years from the date of sentencing. La.Code Crim.P. art. 930.8. Thus, it is necessary that we remand this matter to the trial court and direct the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion, and to file written proof that the defendant received the notice in the record of the proceedings. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## DISPOSITION

We affirm the defendant's sentence in all respects. We remand the matter to the trial court with instructions to the trial court to inform the defendant of the provisions of La.Code Crim.P. art. 930.8 by sending the appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**