# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-9

**STATE OF LOUISIANA**

**VERSUS**

**TONY JACKSON AKA LEOANRDO JACKSON
AKA LEON JACKSON AKA LEONARDO MARICE JACKSON
AKA LEONARD MAURICE JACKSON AKA LEONARD JACKSON
AKA LEONARDO JACKSON AKA LEONARDO M. JACKSON
AKA LEONARD M. JACKSON**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 117,895
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## PHYLLIS M. KEATY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, J. David Painter, and Phyllis M. Keaty, Judges.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

**Michael Harson**
**District Attorney**
**Alan P. Haney**
**Assistant District Attorney**
**Post Office Box 4308**
**Lafayette, Louisiana  70502**
**(337) 291-7009**
**Counsel for Appellee:**
        **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602**
**(337) 491-0570**
**Counsel For Defendant/Appellant:**
        **Tony Jackson**

**KEATY, Judge.**

Defendant, Tony Jackson, was convicted by a jury of armed robbery of the Olive Garden restaurant located in Lafayette, Louisiana, in violation of La.R.S. 14:64. After a sentencing hearing, Defendant was sentenced to fifty years at hard labor with fifteen years of the sentence to be served without the benefit of probation, parole, or suspension of sentence. Defendant appeals his conviction and sentence alleging that: (1) the jury erred in finding him guilty of committing the armed robbery of the restaurant beyond a reasonable doubt and (2) the trial court imposed an excessive sentence. For the following reasons, we affirm and remand with instructions.

## FACTS & PROCEDURAL HISTORY

On October 25, 2007, as the restaurant was closing for the evening, the Olive Garden in Lafayette, Louisiana, was robbed by two armed gunmen wearing ski masks and gloves. The gunmen moved the employees who remained at the restaurant to the back office and demanded money. They took money from the business' safe and the manager's wallet, totaling an estimated $854.00, and left the restaurant. Shortly thereafter, Officer Ron Czajkowski of the Lafayette Police Department spotted a vehicle with no lights on and sought to stop the vehicle. When the officer attempted to make the stop, a car chase ensued. The two occupants of the vehicle thereafter abandoned the automobile behind a local business and escaped on foot.

On December 21, 2007, Defendant was charged by a bill of information with one count of armed robbery and one count of possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. Alexis Almaguer was also charged in the armed robbery as a co-defendant. Victoria Roberts, Almaguer's girlfriend,

was arrested for accessory after the fact to armed robbery. The charges against Victoria were later dismissed. On December 27, 2007, Defendant entered a plea of not guilty to the charge of armed robbery. Count two of the bill of information, the charge of possession of a firearm by a felon, was severed for trial. Defendant's trial by jury on the sole count of armed robbery began on January 31, 2012. Following trial, the jury reached a unanimous verdict of guilty. On May 29, 2012, Defendant was sentenced to fifty years at hard labor with fifteen years of the sentence to be served without benefit of probation, parole, or suspension of sentence. Thereafter, the State, on its own motion, dismissed the second count pertaining to the possession of a firearm by a felon.

On September 17, 2013, a Motion for an Out of Time Appeal was filed on behalf of Defendant and granted by the trial court. For the reasons set forth herein, we affirm Defendant's conviction and sentence. We remand to the trial court with instructions to provide Defendant with written notice of the provisions of La.Code Crim.P. art. 930.8.

## ASSIGNMENTS OF ERROR

This court is charged with reviewing trial court proceedings for errors patent on the face of the record. La.Code Crim.P. art. 920. In so doing, we note one such error. The record reflects that the trial court provided Defendant with erroneous information pertaining to the time period for filing for post-conviction relief. At sentencing, Defendant was advised that he had two years from the date of sentencing to apply for post-conviction remedies. However, in accordance with La.Code Crim.P. art. 930.8, the prescriptive period for filing for post-conviction relief is two years from the date upon which a defendant's conviction and sentence become final as per La.Code Crim.P. arts. 914 or 922.

2

In accordance with La.Code Crim.P. art. 930.8, the trial court is ordered to inform Defendant, by written notice, within ten days of the rendition of this opinion, of the prescriptive period for the application for post-conviction relief. Thereafter, the trial court shall file written proof in the record of these proceedings that Defendant received such notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

## I.    Defendant's First Assignment of Error

***The trial court erred in finding Tony Jackson guilty of armed robbery beyond a reasonable doubt.***

In his first assignment of error, Defendant contends that the trial court erred in finding him guilty of armed robbery as the evidence was insufficient to conclude that he was guilty of the offense charged beyond a reasonable doubt. For the reasons set forth herein, we find that Defendant's first assignment of error is without merit.

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007). The foregoing *Jackson*[1] standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. The appellate court's

_____

[1] *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).

function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

It is well settled that the fact finder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. An appellate court should not second guess the credibility conclusions of the trier of fact, but rather, should defer to the rational credibility and evidentiary determinations of the jury. *Id.* The appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). As stated herein, upon viewing evidence in the light most favorable to the prosecution, the question for the appellate court is whether, on the evidence presented at trial, "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Strother*, 09-2357, p. 10 (La. 10/22/10), 49 So.3d 372, 378 (quoting *Jackson*, 443 U.S. 307).

In those cases relying on circumstantial evidence, the fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984). In the present case, Defendant avers that his co-defendant, Almaguer, lied about his participation in the robbery to protect his stepbrother, Mario Teharis.

A review of the evidence considered by the jury reveals the testimony by Defendant's co-defendant, Almaguer, Almaguer's girlfriend, Victoria, the general manager and assistant manager of the Olive Garden restaurant, several members of

4

the Lafayette Police Department as well as a DNA analyst with the Acadiana Crime Lab who was accepted as an expert in DNA analysis.

The prosecution's main witness was Defendant's co-defendant, Almaguer. Almaguer testified that on the day of the robbery, he and Defendant went to the apartment of Almaguer's girlfriend, Victoria, after work. Almaguer stated that the two men stayed for a couple of hours. Sometime thereafter, they decided to rob the restaurant. Almaguer testified that the two men entered the restaurant wearing masks and gloves. According to Almaguer, both men were armed with guns. Almaguer stated that when they left Victoria's apartment, his gun was already in the vehicle, but he did not know where Defendant's gun was located. He further stated that the masks were already in the vehicle as he had previously purchased them for Halloween.

After entering the restaurant, both men demanded money. The men took money from the restaurant safe as well as the manager's wallet. Almaguer stated that the two men quickly left the restaurant in Almaguer's automobile driving towards the Acadiana Mall. They then stopped the vehicle and took off on foot and headed in different directions. Almaguer positively identified Defendant as the man who accompanied him into the Olive Garden restaurant and participated with him in the robbery of that business. Almaguer was unequivocal in his testimony that his stepbrother, Teharis, did not commit the robbery of the Olive Garden restaurant with him. Under cross-examination, Almaguer admitted that Teharis was at Victoria's apartment where he was visiting his girlfriend, Tess Roberts, but that Teharis did not assist with the plans for the robbery. Almaguer testified that Teharis and Tess were still at Victoria's apartment when he and Defendant left to commit the crime.

The prosecution also presented the testimony of Michelle Stelly, the restaurant's assistant manager. Stelly testified that two people wearing masks entered the restaurant. She stated she thought, based on the voice of one of the robbers, that he was black. She testified that the masked person told the manager, Michael McQuade, to get down and crawl to the corner office. She stated that she then saw another masked man, armed with a gun, wearing white tennis shoes with some kind of blue mark on them. She also noticed that the other man was wearing black "distressed" dress shoes. She further testified that she was unable to identify either man because they both wore masks.

McQuade, the restaurant's general manager, testified that at about 10:40 p.m. on the night of the robbery, two people wearing masks entered the restaurant. McQuade stated that he was counting money with his assistant manager in the cash booth area. He was sealing the last deposit, an estimated $855.00, when he heard someone yell to give him the money. McQuade stated that the first robber put a gun to his head and demanded all of the money. McQuade told the robber that the rest of the money was located in his office. He indicated that the robber made him crawl to his office where he opened the safe. Once the safe was opened, the first robber threw the manager to the ground and started to go through the contents of the safe. According to McQuade, the robbers took "a couple of things" along with his wallet. According to the manager, the entire incident lasted about six to seven minutes. After the robbers left the restaurant, McQuade called 911 to report the crime.

Victoria, Almaguer's girlfriend, testified that at the time of the robbery, she was living on Jeffrey Drive in Lafayette. She stated that both men were at her apartment on the date in question. Contrary to Almaguer's testimony, she testified

6

that Teharis was not at her apartment that day. Victoria stated that the men arrived at her apartment dressed in work clothes and stayed for about two or three hours. She saw Almaguer the next morning around 5:00 a.m. Victoria also encountered the police that same morning. The police had a search warrant and searched her apartment. Victoria testified that about a month before the robbery, she, Teharis, Almaguer, and Defendant all went out to eat at the Olive Garden restaurant. She further stated there were no discussions that night of robbing the restaurant, and further, she was not involved in the planning of the robbery.

On cross-examination, Victoria stated that the two men came to her home at about 5:30 p.m. that afternoon and stayed for about an hour. Defendant left for the store at approximately 7:30 p.m. Victoria stated that she did not see Defendant at her apartment again. She stated that she did not let Defendant back into her apartment that night. Victoria adamantly stated that Teharis was not at her apartment on the night of the robbery. She indicated that she would be surprised to know that Defendant had secreted himself in her bathroom closet in possession of $854.00.

During the course of the trial, several Lafayette Police Officers testified on behalf of the prosecution. Officer Czajkowski testified that he was on patrol on the night of the robbery. He received a dispatch regarding the robbery, and, on his way to the restaurant, he observed a vehicle approaching him without its headlights on. He began following the vehicle whereupon he observed two men exit the vehicle and run into some woods nearby. Officer Czajkowski stayed with their vehicle, and the suspects were not apprehended. Officer Czajkowski described the suspects as two black males. When questioned if he observed any items in the vehicle, Officer Czajkowski testified he saw a money or bank bag on the back seat.

7

Officer Terrance Olivier indicated that he was the first officer at the scene of the robbery and that the manager's wallet was recovered from the vehicle abandoned by the two suspects after they fled on foot. Detective Judith Estorge testified that she obtained a search warrant for the premises of Victoria's apartment located on Jeffrey Drive. Pursuant to the search of the premises, Detective Estorge confiscated $854.00 in cash, a pair of size ten black shoes, a pair of white tennis shoes, two pairs of blue jeans, a pair of gloves, a black sweatshirt, one box of forty caliber bullets, and one box of twenty-two caliber bullets. Detective Craig Mouton also collected evidence from the vehicle as well as DNA samples from Defendant and Almaguer. From the vehicle, Detective Mouton recovered two prescription bottles belonging to Almaguer, black gloves, yellow gloves, and two black ski masks. Detective Mouton testified that several items of evidence were sent to the Acadiana Crime Lab for processing for DNA. Detective Mouton also testified that shoes discovered during the search matched the description of the shoes worn by the robbers as reported by Stelly. While testifying, Detective Mouton identified Defendant as one of the persons from whom he took a reference swab for DNA testing.

Sergeant Blair Dore of the Lafayette Police Department testified that he searched the apartment on Jeffrey Drive pursuant to a search warrant on October 25, 2007. He testified that he located a box under the lavatory with money in it and took some DNA evidence and photographs. He further testified that he located a person hiding on the top shelf of a bathroom closet. He identified Defendant as that person. Additionally, Officer Beau Guidry, as he searched the apartment, discovered a Glock handgun hidden in a box of cereal.

The jury also heard the testimony of Stephanie Buford, Almaguer's mother. She testified that she owns a green Infiniti automobile and that her son had use of it. She testified that she did not see Teharis on the evening of October 25, 2007, but that Teharis had slept at her home the night before. There was a conflict in the testimony between Almaguer and his mother. Almaguer testified that Teharis was with him the night of the robbery. Buford insisted that Teharis was at her house that night.

The State's final witness was DNA analysis expert, Carolyn Booker, an employee of the Acadiana Crime Lab. Booker tested eighteen items in connection with this case. Booker tested a black glove found on the floorboard of the vehicle as well as a yellow glove confiscated from the passenger side of the Infiniti. Booker concluded with "reasonable scientific certainty" that Defendant was the source of the DNA found on these gloves. On a mask found on the front floorboard of the vehicle, Booker discovered a mixture of DNA from three people. Additionally, Booker tested DNA found on the mask found on the back passenger side of the automobile as well as the Glock firearm. Her testimony reflects that she could not exclude either Almaguer or Defendant as contributors to the DNA found on those items.

Defendant contends that Almaguer is identifying him as his co-defendant to protect his stepbrother, Teharis. After examining Teharis's profile, DNA expert Booker explained that all three men could not be excluded as contributors to the mask found on the passenger side of the vehicle. Although Booker could not tell the jury when each man deposited his DNA on the mask, she explained that if more than one person put the mask on, she would be able to detect more than one person's DNA. However, Booker clearly testified that the DNA found on the left

9

black glove with the red lining and on the left yellow glove was "the DNA from one single person and it matched the DNA from Tony Jackson."

The defense called Almaguer on cross-examination, and he again testified, contrary to his mother, that Teharis was at Victoria's apartment on the day of the robbery. He denied that he had ever seen Teharis driving the green Infiniti.

Defendant presented his own DNA expert, Gina Pineda. She reviewed the DNA analysis conducted by the Acadiana Crime Lab. She testified that she reviewed the lab's results, interpreted those results, and made her own conclusions. She then compared Teharis's reference profile with not only the masks and gloves but also the steering wheel. She concluded that Teharis came into contact with the vehicle's steering wheel, but just as the State's expert, Booker, she could not tell when Teharis came into contact with the steering wheel or how his DNA got there. Pineda did confirm that the DNA testing performed by the Acadiana Crime Lab was standard and usual in its methods.

Defendant contends that no rational trier of fact could have found him guilty of the crime charged of armed robbery. A review of the testimony received at trial viewed in a light most favorable to the prosecution clearly supports the finding of the jury.

It is well settled that "[a]s a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." *State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002). It is also well settled that a witness's testimony alone is sufficient to support a verdict as long as that testimony was believed by the trier of fact and that the testimony does not contain internal

contradictions or irreconcilable conflicts with physical evidence. *State v. Dorsey*, 10-216 (La. 9/7/11), 74 So.3d 603, *cert. denied*, __U.S.__, 132 S.Ct. 1859 (2012). In *Dorsey*, 74 So.3d at 634 (citations omitted), our supreme court concluded that,

> A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for a requisite factual conclusion.

The record is not devoid of contradictory testimony. Almaguer testified that Teharis was at Victoria's apartment on the night of the robbery. Almaguer's mother testified that Teharis was at her home. However, as explained in *State v. Bender*, 598 So.2d 629, 636 (La.App. 3 Cir.), *writ denied*, 605 So.2d 1125 (La.1992):

> When a witness is impeached, this simply means the jury, as the trier of fact, was presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury was prohibited from believing anything said by the witness. The inconsistencies in the witness's statements are one of any number of factors the jury weighs in determining whether or not to believe a witness's trial testimony.

Co-defendant Almaguer's testimony alone was sufficient to convict Defendant of armed robbery.

At the outset it should be noted that Defendant was unequivocally identified by his co-defendant, Almaguer, as the person who perpetrated the crime of armed robbery of the Olive Garden restaurant on October 25, 2007. Almaguer's girlfriend placed the two men together at her apartment the night of the robbery. Almaguer's testimony was corroborated by the DNA evidence connecting Defendant to the vehicle, masks, and gloves found by the police in the vehicle and

11

in the apartment of Almaguer's girlfriend. Clothing worn by the robbers, as described by eyewitnesses, was found at the girlfriend's apartment by police during their search of the premises. The State's DNA expert testified that DNA from Defendant was present on two of the gloves. Perhaps, most compelling is the discovery of Defendant hiding in Victoria's bathroom behind a blanket and a pack of toilet tissue in close proximity to a sum of cash within a dollar or two of the amount of money taken in the robbery.

The jury heard the testimony of Almaguer that Teharis was at Victoria's apartment the night of the robbery as well as Victoria's testimony that she did not see Teharis that night. Almaguer's mother told the jury that Teharis was at her house the night of the crime. The jury considered Defendant's hypothesis of innocence contending that Teharis was Almaguer's criminal partner that night. The jury rejected Defendant's theory of the crime. A reviewing court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Calloway*, 07-2306 (La. 1/21/09), 1 So.3d 417. With respect to a jury's rejection of a hypothesis of innocence, our supreme court in *Calloway*, 1 So.3d at 422 (citations omitted), concluded:

> [W]e have repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1079), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law." Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the

12

sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'"

The jury's decision to reject Defendant's hypothesis regarding the commission of the crime was based upon its rational credibility and evidentiary determinations. Accordingly, the jury's verdict should not be overturned. Thus, Defendant's first assignment of error lacks merit

## II.  Defendant's Second Assignment of Error

### *The trial court erred in imposing an excessive sentence.*

Defendant contends that the trial court erred by imposing an excessive sentence. It is noteworthy that counsel for Defendant acknowledges that no motion was filed on Defendant's behalf requesting that Defendant's sentence be reconsidered. Additionally, it is noted that Defendant made no objection to the sentence when it was imposed. In *State v. Batiste,* 09-521 (La.App. 3 Cir 12/9/09), 25 So.3d 981, our court found that where there has been no motion to reconsider sentence as per La.Code Crim.P. art. 881.1(E), the review of one's sentence is limited to a bare claim of excessiveness. In addition, the failure to file such motion prevents Defendant from addressing the trial court's alleged failure to comply with La.Code Crim.P. art. 894.1 which requires the trial court to state for the record the considerations taken into account and the factual basis for imposing its sentence. *State v. Evans*, 09-477 (La.App. 5 Cir. 12/29/09), 30 So.3d 958, *writ denied*, 10-363 (La. 3/25/11), 61 So.3d 653. This court in *State v. Bamburg*, 00-675 (La.App. 3 Cir. 11/2/00), 772 So.2d 356, found that because the defendant failed to object to his sentence at the sentencing hearing and did not timely file a motion to reconsider his sentence, his claim that his sentence was excessive was barred.

Contrarily, our court has "reviewed claims of excessiveness where no objection was made and no motion to reconsider sentence was filed." *State v. Johnlouis*, 09-235, p. 21 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, 1163, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, __U.S.__, 131 S.Ct. 932 (2011). We elect to review Defendant's claim that his sentence was excessive.

The trial court, upon imposing sentence, stated that it had reviewed the pre-sentence investigation, particularly Defendant's prior criminal record. The trial court acknowledged it considered the aggravating and mitigating circumstances as per the applicable provisions of the Louisiana Code of Criminal Procedure. The trial court then sentenced Defendant to fifty years at hard labor. Fifteen of the fifty years must be served without benefit of probation, parole, or suspension of sentence.

Although Defendant's pre-sentence investigation report was not originally a part of the appellate record, this court obtained a copy of the report for review. The report provides a picture of a forty-six-year-old man with a lengthy juvenile record dating back to when he was only thirteen years old. His adult criminal history characterizes him as a third-felony offender. His criminal background includes numerous arrests and convictions for crimes against the person, including offenses committed as a juvenile for which he was tried as an adult. Defendant pled guilty in 1999 to attempted robbery and carjacking in Florida. He received probation which was subsequently revoked. He was sentenced again in 1999 to a probated sentence for robbery and vehicle theft. This probated sentence was also subsequently revoked. The report further reflects Defendant has two pending armed robbery charges that are factually similar to the Olive Garden robbery.

14

Defendant's pre-sentence investigation report recommended a sentence significantly more severe than the sentence imposed by the trial court.

Louisiana Revised Statutes 14:64(B) provides the penalty for the crime of armed robbery as follows: "Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence." Defendant's sentence in this case falls within the middle range of acceptable sentences under the statute.

> La. Const. art. 1, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 51 9U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

> [E]ven when a sentence falls within the statutory sentencing range, it still may be unconstitutionally excessive, and in determining whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has suggested that several factors may be considered:
>
>> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences

> imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

> *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La.5/30/03), 845 So.2d 1061.

*State v. Decuir*, 10-1112, pp. 12-13 (La.App. 3 Cir. 4/6/11), 61 So.3d 782, 791.

According to our supreme court, sentences "within the thirty-five to fifty-year range . . . [are] acceptable for first offenders convicted of armed robbery." *State v. Smith*, 01-2574, p. 7 (La. 1/14/03), 839 So.2d 1, 4. Additionally, the Louisiana Supreme Court has described armed robbery as a "pernicious offense" which "creates a great risk of emotional and physical harm to the victim, to witnesses, and, at times, even to the offender." *State ex rel. Sullivan, Sr. v. Maggio*, 432 So.2d 854, 856 (La.1983). Considering the seriousness of an armed robbery offense in general, the seriousness of the armed robbery offense committed in the present case, and Defendant's prior criminal history, we find that the trial court did not abuse its discretion in its imposition of sentence.

Lastly, Defendant alleges that his co-defendant, Almaguer, was the more culpable of the two defendants and alleges that his co-defendant orchestrated the criminal undertaking. There is no finding by the jury regarding comparable culpability. Defendant's co-defendant pled guilty to armed robbery and possession of a firearm by a felon, and his sentences for his crimes were imposed by the trial court. The fact that the co-defendant's sentence was less than that of Defendant is not equivalent to Defendant being penalized for maintaining his innocence as

suggested by counsel. Similarly, the law does not seek to penalize defendants for the errors or omissions of their counsel. Rather, the law provides a necessary orderly and structured manner in which to afford due process to those accused of criminal wrongdoing.

Defendant asserts that he received a harsher sentence than his co-defendant. As we stated in *State v. Lofton*, 97-383, p. 5 (La.App. 3 Cir. 10/8/97), 701 So.2d 712, 715, *writ denied*, 98-389 (La. 6/5/98), 720 So.2d 679, "it is well settled that a sentence must be individualized as to each defendant. Even when dealing with co-defendants or other defendants with similar records, there is no requirement that the sentences be the same."

We find that, although the reasons provided by the trial court were scant, the trial court clearly stated that it reviewed Defendant's pre-sentence investigation report and considered all of the aggravating and mitigating factors as per the applicable statute. Further, this court has considered Defendant's long criminal history, the pre-sentence report and its recommendations regarding sentencing, and the testimony of the various witnesses at trial regarding Defendant's involvement in this violent crime. We conclude Defendant received an individualized sentence that is not excessive under the law. In accordance with La.Code Crim.P. art. 881.4(D), this court finds that the record supports the sentence imposed upon Defendant. Therefore, we shall not set aside Defendant's sentence for excessiveness. For these reasons, this assignment lacks merit.

**DECREE**

We hereby affirm Defendant's conviction for armed robbery. We also affirm the sentence imposed by the trial court. In accordance with La.Code Crim.P. art. 930.8, we order the trial court to inform Defendant, by written notice, within

17

ten days of the rendition of this opinion, of the prescriptive period for the application for post-conviction relief.  Thereafter, the trial court shall file written proof in the record of these proceedings that Defendant received such notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**