COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

VERSUS

ROBERT N. GREEN

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 9276-10
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Marc T. Amy, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**


**John F. DeRosier**
**District Attorney – 14th Judicial District**
**Carla Sue Sigler**
**Assistant District Attorney – 14th Judicial District**
**P. O. Box 3206**
**Lake Charles, LA 70602**
**Telephone:  (337) 437-3400**
**COUNSEL FOR:**
     **Plaintiff/Appellee – State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602**
**Telephone: (337) 436-2900**
**COUNSEL FOR:**
 **Defendant/Appellant – Robert Neal Green**

**Tara B. Hawkins**
**Attorney at Law**
**P. O. Box 3756**
**Lake Charles, LA 70602**
**Telephone: (337) 660-2232**
**COUNSEL FOR:**
 **Plaintiff/Appellee – State of Louisiana**

**Karen C. McLellan**
**Assistant District Attorney – 14th Judicial District**
**901 Lakeshore Drive – Suite 800**
**Lake Charles, LA 70601**
**Telephone: (337) 437-3400**
**COUNSEL FOR:**
 **Plaintiff/Appellee – State of Louisiana**

**THIBODEAUX, Chief Judge.**

Robert N. Green was convicted of simple rape, a violation of La.R.S. 14:43. He was sentenced to twenty-five years at hard labor, to be served without benefit of probation, parole, or suspension of sentence. Green appeals the conviction and the sentence. Finding no reversible errors in the jury's conviction and no abuse of discretion in the trial court's sentence, we affirm the conviction and sentence and the judgment of the trial court.

## I.

## ISSUES[1]

We must decide:

(1) whether the trial court improperly authorized the State to use a peremptory strike to exclude a Black prospective juror without proper justification;

(2) whether the evidence introduced at trial, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) standard, was insufficient to prove beyond a reasonable doubt, all of the elements of simple rape;

(3) whether the trial court erred in denying Green's motion for a new trial;

(4) whether trial counsel's representation of Green fell below the standard guaranteed by the Sixth Amendment of the Constitution of the United States; and

(5) whether the maximum sentence imposed by the trial court is excessive, in violation of the Eighth Amendment of the Constitution of the United States and La. Const. art. 1, § 20.

---

[1]Pursuant to La.Code Crim.P. art. 920, the appeal was reviewed for errors patent, and none were found.

II.

## FACTS AND PROCEDURAL HISTORY

Sometime between the night of October 31, 2009, and the morning of November 1, 2009, Robert Green committed simple rape of the victim, S.M.[2] (age seventeen). Green and the victim were both working at McDonald's on the night in question. Green provided the victim with alcohol and then asked her for a ride home. After consuming more alcohol, the victim passed out and awoke to Green on top of her, performing sexual intercourse. Both the victim and Green were nude. Green told the victim to get dressed and drove her home where they were met by the victim's distraught parents. The victim was later examined at the hospital, and she had a blood alcohol level of .08/.09%.

IV.

## LAW AND DISCUSSION

### *Assignment of Error No. 2*

In this assignment of error, Green challenges the sufficiency of the evidence used to convict him. We address this issue first because if the evidence is insufficient, the defendant must be discharged as to the crime, and any other issues become moot. *See State v. Hearold*, 603 So.2d 731, 734 (La.1992).

Green asserts that the evidence was insufficient to prove the elements of simple rape, specifically, sexual intercourse and lack of consent because of intoxication. At the time of the offense, La.R.S. 14:43 provided in pertinent part:

> A. Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is

---

[2]Pursuant to La.R.S. 46:1844(W), the victim's initials are used to protect her identity.

2

committed under any one or more of the following circumstances:

(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity.

When insufficient evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). It is the fact finder's role to weigh the credibility of the witnesses; thus, the appellate court "should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review." *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

## *Evidence*

The first witness to testify for the State was Dustan Abshire, a detective sergeant with the Calcasieu Parish Sheriff's Office. He was contacted by a patrolman and informed that the victim was at Lake Charles Memorial Hospital. When Detective Abshire reached the hospital, the victim was being examined by a sexual assault nurse. After speaking with the nurse, Detective Abshire believed a rape may have occurred. Since the victim was intoxicated, Detective Abshire sent her home with her parents and stated that he would contact her later for an interview.

When asked what led him to believe that Green was a suspect in the case, Detective Abshire responded:

3

A. According to [S.M.], she worked with Mr. Green at McDonald's. They got off about the same time. And, she advised he had asked her to bring him home that night. They went from that point - - instead of going home, she went - - he asked to bring her to the Exxon station - - the McDonald's excuse me. The McDonald's they worked at was the one at Broad and 14. When they got off of work he asked if she could go to the Exxon next door so he could pick up some more vodka. And, they went from there to wherever they went that night after that.

Detective Abshire testified that he received a surveillance video corroborating S.M.'s testimony that she and Green had been at the Exxon across from McDonald's at approximately 11:20 p.m.

Green's version of the night's events were different. Detective Abshire testified that in his statement Green said they both worked late, but left McDonald's separately:

He advised she left before he did, and he walked home. He said he - - she didn't get a ride from him. He did not go to the Exxon with her, and he didn't see her until approximately 4:00 that morning when she was intoxicated. He advised me that she was intoxicated and needed a ride home. He drove to his mother's house, contacted her, said that he was bringing a coworker home who was intoxicated and asked his mother to follow him home.

Green's mother gave Detective Abshire a statement corroborating Green's statement.

The following evidence was presented to the jury by stipulation:

The agreement is that the video shows a pickup truck owned by [the victim's father] and driven by [the victim], occupied by Mr. Robert Green, arriving at that Exxon station on October the 31st of 2009 between 11:15 p.m. and 11:20 p.m. And, it shows Robert Green exiting the passenger side of that pickup truck, entering the Exxon store, purchasing alcohol, appearing to be Taaka vodka, and exiting the Exxon station and re-entering that pickup truck on the passenger side.

4

The victim testified that she was eighteen years old at the time of trial and that her birthdate was September 3, 1992. In October 2009, the victim worked at McDonald's on Broad Street in Lake Charles; she was seventeen and was a junior in high school. The victim had driven her dad's truck to work. She was scheduled to get off at 10:00, but her manager asked if she could work a little while longer. The victim said she knew Green by "Rob" but did not know much about him. They began having "small talk" and working the same shifts. When asked if she and Green were friends, she said "no" and described Green as an associate or co-worker. The victim stated that before she left work at 11:00, Green asked if she wanted some alcohol. The victim said, "Sure." She stated that he went on break, walked across the street, came back and gave her a drink in a small cup, containing alcohol mixed with orange-colored soda or Hi-C.

According to the victim, she had only tried alcohol once before. She said she drank the entire drink given to her by Green, which she estimated was six ounces. She said she "chugged it" to get rid of it before leaving work. According to the victim, Green told her that he was going to get off early and would meet her outside. When they met outside, Green had more alcohol. When asked if she was feeling the effects of the alcohol after the first drink, the victim replied, "A little bit." After the victim accepted another drink from Green, Green asked the victim for a ride. At Green's request, she drove him to the Exxon across the street from McDonald's where Green bought more alcohol. Green then asked her to take him to his cousin's house. Green's cousin came out to the truck, and they visited for approximately twenty minutes. The victim said she had another drink at that time, which she fixed herself. Realizing she could no longer drive, the victim allowed

5

Green to drive her dad's truck. She got in the back seat; Green backed the truck up; she saw the stop sign; but "after that, everything else just kind of went away," and she blacked out.

The next thing the victim remembered was coming to in Green's room and seeing Green naked on top of her:

> Q. And, what was Robert doing?
>
> A. At that time I didn't know, but I'm guessing it was sexual intercourse with me.
>
> Q. Where was he when you saw him?
>
> A. When I saw him he was straight on top of me.
>
> Q. Did you have any clothes on?
>
> A. No, ma'am.

When asked if she had any doubts as to who was on top of her, the victim said, "No, ma'am. I have no doubts." The victim explained why she believed she had been asleep and why she believed Green was having sexual intercourse with her:

> A. Okay. Were you asleep prior to this?
>
> A. I believe so. Because, when I was coming to, I felt pain, but I didn't know where it was coming from. And, it was like I was coming out of my, you know, blackout. And, I didn't know where it was coming from. But, when I woke up I realized that, you know - - I realized where the pain was coming from.
>
> Q. Okay. And, where was the pain coming from?
>
> A. Down in this area down here. [Indicating her vaginal area].

6

According to the victim, Green told her to change in the bathroom, and he gave her clothes to put on. No other words were spoken. As for the pain in the victim's vaginal area, the following colloquy took place:

> Q. You said you felt pain in your vaginal area. Did it feel like he had penetrated you?
>
> A. Yes, ma'am.
>
> Q. Do you believe it was his penis or some other object? What was it?
>
> A. I believe it was his penis.
>
> Q. Okay. Did you - - so, you opened your eyes and he's penetrating you vaginally, and you don't say anything?
>
> A. No, ma'am.
>
> Q. Okay. Does he continue to penetrate you or - -
>
> A. No, ma'am.
>
> Q. - - does he stop at that time?
>
> A. He stops at that time.

After the victim changed into the clothes given to her by Green, Green led the victim to the truck. When asked why she did not ask Green any questions, the victim responded that she was still pretty intoxicated at that point and just wanted to go home.

> Q. Okay. At any time did you give consent to having intercourse with Robert Green?
>
> A. No, ma'am.

As for the victim's memory of the night in question, the following colloquy took place:

7

Q. Were you all planning to go to his house to have sex that night?

A. No, ma'am.

Q. Or for any other reason, to continue to drink?

A. No, ma'am.

Q. Did y'all plan to go there just to hang out?

A. No, ma'am.

Q. Do you recall him inviting you to his house?

A. No, ma'am.

Q. Do you recall taking off your clothes at his house?

A. No, ma'am.

Q. Do you recall how you ended up nude?

A. No, ma'am.

Q. Do you recall your clothes being washed or how they got wet at all?

A. No, ma'am.

Q. So, all you know is what he told you about what happened?

A. Yes, ma'am.

Since the victim was still intoxicated, Green drove her dad's truck. The victim remembered giving Green directions to her house and remembered going into Wal-Mart to use the restroom. When asked if she was aware when she was leaving Green's house and if she was awake while in the truck, the victim replied, "Yes, ma'am. I was awake." The victim saw Green's mother when she exited Wal-Mart. When asked if they made it to her house, the victim replied, "No, ma'am. . . . We got stopped on the corner right by my house." She stated:

> A.    I remember - - I remember feeling the truck stop. And, then I remember my passenger door just like swinging open. I remember my dad getting me out of the car. And, when I got out, that's when like they were, uh - - a cop car with lights on, and the church - - there's a church on that corner, in the church parking lot. And, I remember seeing my mom and my dad and a cop there . . . .

The victim also remembered that she was on the cell phone with her sister when she felt the truck stop. The victim had her cell phone with her the entire night but did not remember it ringing. She remembered the police officer checking her alcohol level and then going home. She did not stay at home long, however, because her parents took her to the hospital when they noticed that she did not have anything on underneath the warm-ups. She said a bag containing her uniform and undergarments was in the truck.

The victim testified that she was still "pretty drunk" when she got home and did not tell her parents anything. At the hospital, the victim was examined by a nurse. According to the victim, she was a virgin on October 31 and had not had sexual intercourse. The victim remembered giving a statement to Detective Abshire and telling the detective that she did not remember whether she woke up with Green on top of her and penetrating her. When asked to explain the inconsistency in her statement to police with her testimony at trial, the victim replied:

> A.    When he started questioning me, that was soon after, and there could have been some embarrassment there. But, later on, when I had to go in front of [the] grand jury they told me to - - he told me to actually really think. And, some of the things started coming back to me. And, then I remembered that part because I couldn't figure - - I remembered the pain vividly. . . .

9

When asked if she was hung over after she left the hospital, the victim stated that she felt bad and slept most of the day. According to the victim, she did not have any bruises on her body when she went to work, except basketball bruises "mainly on [her] leg." She testified as follows:

> Q. Okay. If the SANE nurse says that she saw bruises -- a bruise -- a big, purple bruise or dark bruise on the upper part of the buttock, can you attribute that to anything?
>
> A. No, ma'am.
>
> Q. Okay. And, if she said she found bruises on your neck or your collar bone, do you have any recollection of what that could be or where it could come from?
>
> A. No, ma'am.
>
> Q. Do you remember seeing those bruises on yourself?
>
> A. I remember seeing them after they got called to my attention, but they weren't there before, so.
>
> Q. Okay. They weren't there before when?
>
> A. They weren't there before I went to work. They weren't there when I know I left work.

On cross-examination, the victim admitted that she told neither the police nor the SANE nurse that she had been raped. When asked why she did not tell either one of them, the victim explained that she was embarrassed and wanted everything just to go away. The victim was pretty sure she had more than three drinks but remembered only three. She testified that she was positive that she never told Green she wanted to have sex with him. The victim stated she "didn't say a lie" to the SANE nurse or the detective; she just "didn't say anything at all" because she wanted to keep it to herself. She testified that she still had trouble talking about it.

The victim's mother testified that when her daughter did not come home at the appropriate time, they began calling her cell phone, drove around looking for her, and called the police. About 4:00 a.m., the victim's parents spotted the truck. After getting the truck to stop, the victim's mother ran up to the truck looking for her. She said the victim was "in and out" and "non-responsive." She was a passenger in the truck, and a man was driving. The victim's mother quickly noticed that the victim was not wearing her clothes and that her hair was a mess. When the victim and her parents arrived at home, the victim's mother took the victim to the bathroom. Seeing that the victim was wearing nothing under her clothes, the victim's mother brought the victim to the hospital. When asked if the victim was able to explain what had happened before they arrived at the hospital, the victim's mother replied:

> A.     Nothing. [S.M.] was in and out. And, when we got in the truck she had done passed out again on the way to the hospital. We was able to go into the Memorial Emergency Room. And, of course, the triage, you know, before they call in for triage, that took a while. She fell asleep again right there, just knocked out. It's like she didn't really know where she was or what she was doing.
> . . .

The victim's father testified that when the victim was in the truck with Green on the night in question, she was "[i]n and out, and like she was - - she was - - she was conscious, and then she was like she would just drop out, conscious, and then she would drop out." He described the scene as follows:

> A.     He didn't get out of the truck right then, because my wife got out of the car, and I had him - - I was by the driver's side talking to him, because at that time I was about to lose it. And, my wife was on the other side saying, "Oh, my God, my child, my child. What you done to my child? What you done to my child?" And, at that time I said, "Man, what is going on here?" Then he got out of the vehicle when I stated, "What is going on

11

here?' Then he said, "I'm just bringing her home." And, my wife said - - immediately said, "Why is my daughter like this? And, on top of this, she don't even have her clothes. She don't have the clothes that she had on when she left my house. Where is [sic] her clothes?" Then Mr. Green stated that he washed her clothes. I said, "Man, what is going on here?" He said, "I didn't do nothing. I didn't do nothing. I didn't do nothing." And, he was on a cell phone, "Keep coming. Keep coming. Oh, yeah, I can see your lights. Keep coming. Keep coming." I said, "Man, what did you do here? I need to know what's going on." "Oh, I didn't do nothing. I didn't do nothing. All I did was bring her home. I didn't do nothing. I didn't do nothing." And, he's steady on this cell phone, "Keep coming. Keep coming. Keep coming."

Even though the victim's father tried to get Green to stay until the police arrived, Green did not stay. Green's mother arrived at the scene about ten minutes after the victim's parents stopped the truck. According to the victim's father, the victim appeared to be highly intoxicated. The victim's father denied ever suggesting to his daughter that Green raped her.

Leanne Suchanek, the DNA technical leader at the Southwest Louisiana Crime Lab, was accepted as an expert in the field of forensic DNA analysis and serology testing. Ms. Suchanek performed a DNA analysis on the sexual assault kit collected from the victim as well as a reference sample collected from the suspect. No evidence of seminal fluid was found in the victim's kit, and the only DNA found under the victim's fingernails was the victim's DNA. Nothing on the items submitted to Ms. Suchanek traced backed to Green. Ms. Suchanek concluded her direct testimony by stating that "[t]he absence of DNA does not definitively preclude any contact." On cross, Ms. Suchanek clarified that the only item tested for DNA was the swabs from the victim's fingernails.

Margaret Steele, a forensic analyst with the Southwest Louisiana Crime Lab, was accepted as an expert in blood alcohol analysis testing. Ms. Steele tested the blood alcohol level from a sample taken from the victim. The sample was received by Ms. Steele from the Calcasieu Parish Sheriff's Office. According to Ms. Steele, "the ethanol was present at 0.09 gram percent in the blood sample from the kit taken from [S.M.]." Ms. Steele further testified that a kit was sent to a laboratory called "AIT" for a complete drug analysis. The blood sample tested by AIT tested positive for ethanol at 0.086 percent. Ms. Steele explained the decrease in the ethanol content could have been caused by the AIT Laboratory using a different vial of blood or from the evaporation of the alcohol caused by opening the vial.

Tammy Vincent, accepted as an expert registered nurse in the field of sexual assault nursing, examined the victim at approximately 8:00 a.m. on November 1, 2009, at Lake Charles Memorial Hospital. According to Ms. Vincent, a sexual assault examination consists of an examination of the victim from head to toe, taking pictures of any injuries, drawing blood, and making referrals as needed. Ms. Vincent read to the jury the following excerpt from her report:

> A. Okay. This is my report. "Awake, alert, oriented x 3, black female, skin warm and dry, moves all extremities, no respiratory distress. Patient was sleeping when I arrived to greet her. She woke easily. She ambulated to the office where we do the exam without difficulty. Patient states, 'Me and Rob got off about the same time. He lives around the corner, so I was going to give him a ride. He said he had to go to the gas station. He bought me a drink and gave me some. It was, I think, Taaka vodka and Hi C I think. I drank about half of a cup, and it wasn't that big.' Patient states the next thing she remembers is that she woke up in his room in a bed and, 'I remember walking out of the room with his

clothes on because he said he had washed mine. They were wet and he had cleaned where I had thrown up. He had his mom follow us because I wasn't in any shape to drive. I had to use the bathroom, so we stopped at the Wal-Mart. He drove me home. He passed up my street. The truck stopped and my parents got him out of the truck. It was the corner by my house.' And, she states she thinks the police were already there."

As for her physical exam of the victim, Ms. Vincent stated:

A.    Okay. No. 1 says, "Bruise, dark purple." This is going to indicate where the bruise is. That is going to be on her hip on the left side about right here. No. 2 says, "Swollen and tender." This is up here at the top of her head on her forehead right here. No. 3 says, "Faint redness." No. 3 indicates these areas right here on her neck. And, No. 4 says, "Swollen and tender," up here on the right what we call the clavicle bone. That's this bone here that goes from your shoulder to the nape of the neck. And, No. 5 says, "Abrasions from basketball." This is an abrasion on her knee that she reported to me she got playing basketball. So, she knew how she got that injury.

Q.    How did you ask her about all of these, 1 through 4?

A.    She did not indicate to me that she knew how she had received those injuries.

She next testified regarding the female genital diagram and analysis:

Q.    Tell me what part of the body that is and what those two numbers indicate.

A.    Okay. No. 1, this is an area that we call the posterior fourchette and the fossa navicularis. These two areas are the most frequently injured area in the genital area. No. 4 say, "Positive toluidine blue dye uptake in the folds." In other words, there was some - - there was a fold there that toluidine blue dye stuck to. And, want [sic] toluidine blue dye is a blue dye that's often used in labs for other things. But, sexual assault nurse examiners use this dye to apply it to an area that appears to be an injury. And, the blue dye adheres to the nucleated cell. And, what that means is it adheres to the nucleus. You are only going to have a nucleus in a torn area of the skin. So, in order for it to stay there after I wash it away with vinegar water, it's only going to indicate that that area of skin is not intact any longer.

14

Ms. Vincent reported that on "No. 3," the victim's hymen was described as having "[r]edness and abrasions with petechia." She stated that the redness could be irritation from contact; the abrasion was from some type of blunt force; and the petechia was a pinpoint bruise that sometimes occurs with injury. When asked what she saw when she examined the victim, Ms. Vincent replied:

> Q. Okay. Blunt force on the hymen, that's what you stated you witnessed or you saw from your examination?
>
> A. That's what I saw on my examination.
>
> Q. Okay. And, you know this is blunt force because of the petechia that's left there?
>
> A. Because of the abrasion.
>
> Q. Because of the abrasion, okay. And, No. 2?
>
> A. No. 2, there are two tears seen. We saw those also before and after application of the toluidine blue dye.
>
> Q. So, she had two tears in that area, as well?
>
> A. Yes, ma'am.
>
> Q. Okay. So, 1, 4 and 2 show four particular tears. And, that's the outer area or the inner area, immediate inner area of the vagina?
>
> A. That is considered the inner area because you have to separate the labia or the lips in order to see these areas.
>
> Q. Okay. And, these - - this tearing, is that consistent? What does that tell you as a SANE nurse examiner? Are you able to reach any conclusions about what this means this young lady experienced?
>
> A. Well, these findings are consistent with the history that she gave me of being possibly assaulted.

Ms. Vincent said the victim did not appear to be in any physical distress but she did complain of pain and tenderness during the vaginal exam. On cross-examination, Ms. Vincent testified that other than the bruise from basketball,

15

the victim had no explanation for any of the other bruises. When asked if she could tell how long the bruises (other than the basketball bruise) had been there, Ms. Vincent testified, "I can say that they are newer. I cannot time date any kind of bruising." Ms. Vincent further stated the bruises appeared to be fresh because they were still in the phase of lighter colors. According to Ms. Vincent, once a bruise turns brown or yellowish, it is usually older than two or three days. Ms. Vincent further explained that the abrasion labeled No. 1 was the "most frequently injured area of the genitalia after sexual assault[,]" but the area can potentially be injured another way. As for the abrasions labeled No. 2, Ms. Vincent testified that they were caused by some type of blunt force trauma, but she could not say that they were caused by a penis. Ms. Vincent also testified that she did not believe the injuries to the victim's vagina were caused by scratching.

Green argues that the State failed to prove two elements—intercourse, and lack of consent because of intoxication—where the victim stated that she *guessed* that Green was having sexual intercourse with her, and she *believed* that he penetrated her with his penis. Green notes that the victim's initial statement to Detective Abshire was that she did not remember if anything sexual occurred. He further notes that the SANE nurse could not say whether the tears in the victim's vagina were caused by a penis. He also argues that no seminal fluid was found in the victim's vagina, and his DNA was not found in the items tested. Further, Green asserts that digital penetration could have caused the injuries noted by the SANE nurse, and if the jury found that intercourse had occurred, the State failed to prove that it was without the victim's consent. The State contends that the victim's use of the word "believe" did not undermine the sufficiency of her testimony as to

16

penetration; that her testimony alone was sufficient to establish penetration; and that her testimony was supported by the physical findings of the SANE nurse.

*Analysis*

The evidence was sufficient to prove sexual intercourse. When asked by the State if it felt like Green penetrated her, the victim replied affirmatively. The victim also stated she believed the penetration was with Green's penis. When the victim awoke, Green was on top of her and was not wearing any clothes. The victim also felt pain coming from her vaginal area. Upon examination, the SANE nurse found redness, abrasions, and petechia consistent with sexual assault. Although no seminal fluid was found in the victim's vagina, it is well-settled that "[e]mission is not necessary . . . ." La.R.S. 14:41(B). Additionally, "any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La.R.S. 14:41(B).

In *State v. Ross*, 03-564 (La.App. 3 Cir. 12/17/03), 861 So.2d 888, *writ denied*, 04-376 (La. 6/25/04), 876 So.2d 829, this court was faced with a similar issue. There, the defendant complained that the evidence was insufficient to prove penile penetration, citing *State v. Marigny*, 532 So.2d 420 (La.App. 1 Cir. 1988) (insufficient evidence of penetration; victim testified she and the defendant "had sex;" and no medical evidence of penetration was presented).

The *Ross* court, however, found another case more similar—*State v. Self*, 98-39 (La.App. 3 Cir. 8/19/98), 719 So.2d 100, *writ denied*, 98-2454 (La. 1/8/99), 734 So.2d 1229. Prior to trial, the victim in *Self* described only improper "touching" by the defendant. There was physical evidence of abuse, however, and at trial, the victim answered "Yes" when asked, "'Did he ever put his private part

17

together with yours?'" *Ross*, 861 So.2d at 895 (quoting *Self*, 719 So.2d at 101).

Applying the *Jackson* standard, the court in *Self* found sufficient evidence of penetration based upon the victim's testimony and that of the pediatrician, a specialist in child abuse, who testified that the victim's vagina had been penetrated. *Id.* Following *Self*, this court found penetration in *Ross* where the victim's testimony was supported by two physicians who examined her. The court concluded that there was no evidence in the record to support the defendant's contention that there was only digital penetration. Consequently, in viewing the evidence in the light most favorable to the prosecution, the court found that the evidence was sufficient to support a conviction of aggravated rape. *Id.*

As stated earlier, it is well-settled that the victim's testimony, alone, is sufficient to establish penetration. *State v. Allen*, 02-593, p. 3 (La.App. 3 Cir. 11/6/02), 830 So.2d 606, 608. Considering the victim's testimony in the present case—she answered affirmatively when asked if she felt penetration; she believed the penetration was from Green's penis; and she felt pain when she awoke to Green on top of her—along with the physical findings that were consistent with sexual assault, the evidence was sufficient to prove the sexual intercourse element in the present case. *See State v. Traylor*, 42,218, p. 5 (La.App. 2 Cir. 6/20/07), 961 So.2d 571, 574, *writ denied*, 07-1561 (La. 1/11/08), 972 So.2d 1163, where the court found that even though the victim's cross-examination may have caused confusion as to whether there was penetration by the defendant's penis or finger, the victim's testimony of penile penetration was supported by physical evidence, and the jury, as the trier of fact, weighed her testimony.

Green further challenges the sufficiency of the evidence that the victim was unable to consent or resist because of stupor or abnormal condition of

18

mind produced by an intoxicating agent. Green points out that the victim accepted the first two drinks from Green; the victim prepared the third drink herself; the victim described the drinks as child-sized; the victim was able to go to the restroom at Wal-Mart without help; the victim recalled speaking to Green's mother when she exited Wal-Mart; and the SANE nurse described the victim as being awake, alert, and ambulatory. Green further notes statements by the victim indicating her thought processes: "When asked why she did not get help or call her father while inside Wal-Mart, she first said she was not afraid and knew that she was in trouble." However, Green notes: "She later said that Green had her father's truck and she needed to stay with the truck. Both responses are indicative of thought processes." These same facts, Green contends, "apply to the third element—that Green knew of S.M.'s level of intoxication."

In response, the State points out that the victim's blood alcohol level was determined to be between .086% and .09%, and there is no testimony that the victim had any more to drink after the alleged rape. The State further notes that the victim had consumed alcohol only once before at a family reunion; she had at least three drinks on the night of the rape; she blacked out after she crawled into the backseat of the truck; and Green told her she vomited on herself. Additionally, the State refers to the testimonies of the victim's mother and father as to the condition of the victim when she was brought home.

In *State v. Clouatre*, 12-407 (La.App. 1 Cir. 11/14/12), 110 So.3d 1094, the defendant claimed the evidence was insufficient to prove the victim was incapable of resisting due to stupor or abnormal condition of mind produced by an intoxicating agent. The defendant argued that the victim's own testimony that she told him to stop two times as he pulled her shorts down proved she was capable of

resisting or understanding, was able to cry out and awaken others for help, and was

"completely aware at the time as to the nature of the act." *Id*. at 1098. In response,

the first circuit articulated that

> the "stupor or abnormal condition of mind produced by an intoxicating agent" element of simple rape does not require unconsciousness or such incognizance as to render the victim unaware that she was raped; nor do the victim's verbal protestations during the act of rape indicate that she was necessarily capable of effectively resisting being raped. As the third circuit noted in *State v. Clark*, 2004-901 (La.App. 3rd Cir. 12/8/04), 889 So.2d 471, 475, "the very purpose of the simple rape statute [is] to criminalize behavior which takes advantage of a person who has had too much to drink and participates in an act to which he or she would not otherwise have consented." In *Clark*, C.T., the female victim, had smoked marijuana and taken a muscle relaxer. C.T. testified that after sleeping for a while she was awakened by the sound of the defendant coming into her room. He took off his clothes, got in bed with her, and proceeded to have sex with her. *Id.* at 472-73. She testified that she was "frozen" and did not fight him off, scream to a friend for help, or try to get away. Rather, she pleaded with him to stop and was overpowered by him. She stated that he pinned her down, but he did not threaten her and was not violent with her. The defendant testified the sexual act was consensual. The third circuit found that under these facts, the defendant was guilty of simple rape. *Id.* at 475.
>
> In *State v. Porter*, 93-1106 (La. 7/5/94), 639 So.2d 1137, 1143, the supreme court stated that a "defendant may be convicted of simple rape when the victim's capacity to resist was negated by an abnormal condition or state of mind produced by alcohol consumption." In *Porter*, there was evidence of alcohol consumption by the victim and of an alcohol-influenced state of mind. Although the victim denied excessive drinking and recalled the events of the ordeal, a reasonable juror could have concluded that the essential elements of simple rape had been proved. There was evidence from which the jury might have inferred, despite the victim's protestations of resistance, that she became intoxicated with these two young men and that they criminally took advantage of her alcohol-influenced incapacity to resist their advances effectively. *Porter*, 639 So.2d at 1143.

. . . .

> In *State v. Fruge*, 2009-1131 (La.App. 3rd Cir. 4/7/10), 34 So.3d 422, 430-32, *writ denied*, 2010-1054 (La.11/24/10), 50 So.3d 828, a case similar to the instant matter, J.H. drank alcohol, then fell asleep on the couch. She was awakened by the defendant kissing on her neck, grabbing her breasts, then finally vaginally penetrating her. J.H. yelled for her sister, kept screaming "no," and finally pushed the defendant off of her. The defendant denied having sex with J.H. He also testified he was drunk and did not know exactly what was going on. The third circuit found that under these facts, the State proved beyond a reasonable doubt that the defendant committed simple rape.
>
> Thus, the jurisprudence on the offense of simple rape makes clear that the element of stupor or abnormal condition of the mind produced by an intoxicating agent, such as alcohol, does not require an unaware victim with no capacity to resist, but rather an agent-influenced incapacity to *effectively* resist the advances of the perpetrator. *See Porter*, 639 So.2d at 1143. The degree of alcohol influence is for the jury to decide. *Id.* The jury in this case, heard the testimony, viewed the evidence presented to it at trial, and found the defendant guilty. The jury apparently believed A.H.'s testimony, which revealed that the defendant, after providing enough alcohol to A.H. to make her sick and pass out on the sofa, lay down on the sofa with her and proceeded to rape an inebriated fourteen-year-old girl who could not effectively resist his advances.

*Clouatre*, 110 So.3d at 1099-1100.

Considering the above jurisprudence, the evidence was sufficient to prove the victim in the present case was incapable of resisting because of a stupor induced by intoxication. By Green's own admission, he drove the victim home because she was too intoxicated to drive. The victim's own testimony, the testimony of the victim's parents, the testimony of Detective Abshire, and the blood alcohol results all support a finding that the victim was intoxicated. Since Green was with the victim the entire time and provided the victim with her first

two drinks, the evidence was sufficient to prove he knew or should have known of the victim's incapacity. The jury apparently believed that the victim's intoxication caused her to be unable to effectively resist Green's advances. This determination was reasonable in light of the evidence. Thus, the evidence was sufficient to convict Green of simple rape.

## *Assignment of Error No. 1*

Green asserts that the trial court erred in allowing the State to use a peremptory strike to exclude Lawrence Mitchell, an African-American male, as a juror in this case. We disagree.

The Equal Protection Clause of the United States Constitution prohibits engaging in purposeful discrimination on the grounds of race in the exercise of peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986).

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensive reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]

*Alex v. Rayne Concrete Serv.*, 05-1457, p. 15 (La. 1/26/07), 951 So.2d 138, 150-51.

22

Likewise, La.Code Crim.P. art. 795 provides:

C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

In discussing the first *Batson* criterion, i.e., the defendant's prima facie showing that the prosecutor exercised a peremptory strike for racial reasons, the United States Supreme Court has stated:

We begin with *Batson* itself . . . . There, we held that a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives "rise to an inference of discriminatory purpose." We explained:

"[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race."

23

*Johnson v. California*, 545 U.S. 162, 169, 125 S.Ct. 2410, 2416-17 (2005) (quoting *Batson*, 476 U.S. at 94, 96) (citations omitted)[3]. Thus, "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170.

In *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317 (2005), the Supreme Court described the second criterion, i.e., the prosecutor's race-neutral explanation for exercising the peremptory strike. "Although there may be 'any number of bases on which a prosecutor reasonably [might] believe that it is desirable to strike a juror who is not excusable for cause . . ., the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e].'" *Id.* at 239 (quoting *Batson*, 476 U.S. at 98, n. 20).

The Court in *Rice v. Collins*, 546 U.S. 333, 126 S.Ct. 969 (2006) discussed the third step of the *Batson* analysis, i.e., wherein the court must determine whether the defendant has carried his burden of proving purposeful discrimination. "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Id.* at 974 (quoting *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769 (1995).

---

[3]Before *Batson*, the defendant's burden in step one was to show "an extended pattern" or "continuity of discrimination over time" by the prosecutor, but this proved a "crippling burden of proof." *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324 (2005). Subsequently, *Batson* held that "a defendant could make out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial." *Miller-El*, 545 U.S. at 239 (quoting *Batson*, 476 U.S. at 94, 96).

*Snyder v. Louisiana*, 552 U.S. 472, 476, 128 S.Ct. 1203, 1207 (2008) (citations omitted), provides the standard of review for *Batson* challenges:

> On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge[.]" In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.,* nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court][.]"

For the following reasons, we find no clear error on the part of the trial court in denying Green's *Batson* challenge and in granting the State's peremptory strike of Mr. Mitchell as a potential juror.

### *Analysis*

For purposes of context and clarity when pronouns are used, the defendant in this case is a Black male; the victim is a Black female; the prosecutor is a Black female, and the potential juror, Mr. Mitchell, is a Black male. The record reflects that four of six jurors had been selected, and that the prosecutor sought to use her third peremptory strike to eliminate Mr. Mitchell as a juror, when Green raised the *Batson* challenge now under appeal. At that time, the following colloquy occurred:

THE COURT:

Juror No. 236, Mr. Mitchell, will be excused with the third peremptory of the State.

MR. COWARD:

Judge, at this time I'm going to lodge a *Batson* exception. I know it's just the first -- this is the first African American being stricken, but I think that the State should have to give some race neutral reasons for Mr. Mitchell. He indicated he could be totally fair. I don't see any reason for him to be stricken, other than potentially an ethnic, challenge.

. . . .

THE COURT:

At this time I'm not going to require the State to make any race neutral -- there's only been one exclusion --

MR. COWARD:

Yes, sir.

THE COURT:

-- on a peremptory. I don't see a prima facie case, that there's been any motive or –

MR. COWARD:

It's just -- it's the first one.

THE COURT:

-- tendency of the State to excuse –

MR. COWARD:

I'm sorry.

THE COURT:

-- African American [jurors].

MR. COWARD:

26

I didn't mean to interrupt you. I'm sorry. It's just the first one, Judge. I mean, there's only been one. The very first one is stricken, so that's part of the reason for my *Batson* challenge.

THE COURT:

We've got four jurors. There's [sic] only two spots left, Mr. Coward.

MR. COWARD:

I understand.

THE COURT:

It's not like we have a lot of room.

MR. COWARD:

Yes, sir.

THE COURT:

But at this point I don't see the prima facie case in place.

Subsequently, the prosecution exercised a peremptory strike to exclude Mr. Herman Singleton, also a Black male, from the jury. Green again raised a *Batson* challenge to the peremptory strike, stating that the prosecutor had already tried to exclude Mr. Singleton for cause, and Green thought her peremptory strike was racially-motivated. The trial court asked the prosecutor for a response, and she replied that she would re-urge the same reasons that she stated in seeking to strike him for cause. The State's reasons for striking Mr. Singleton for cause had been his expression of specific biases against young girls of today, stating that they are wild, aren't raised properly, don't dress properly, and flirt with older men. He also indicated a view that Black males do not get a fair break in the penal system. The State also discussed Mr. Singleton's detailed discussion of

27

being targeted with threats after witnessing a killing in New Orleans, indicating that he might have difficulty sitting on a jury.

Previously, immediately following the State's challenge for cause, the trial court had stated that it too had concerns about Mr. Singleton's partiality, but since he was not otherwise disqualified under La.Code Crim.P. art. 797, the trial court declined to strike him for cause. For the peremptory strike, however, the trial court now stated that it had been a close call on Mr. Singleton for cause, and, having already expressed those concerns, the court indicated that it did not need [further] rationalization for the peremptory strike.

Having approved the peremptory strike against Mr. Singleton, who was the second Black person at issue, the trial court now asked the prosecutor to go back and give race-neutral reasons for her first strike against Mr. Mitchell. The prosecutor responded as follows:

> Mr. Mitchell is a young man. Didn't just - - just not making a lot of eye contact with me as a witness seems not necessarily favorable to me as a person. And I may have misspoke[n] when I said "as a witness."
>
> When dealing with him and speaking with him and just watching his interactions during the course of the proceedings, he's not made a lot of eye contact with the State. Seems indifferent to the entire process and being here. He works in a warehouse at Halliburton which is known for paying a pretty decent wage. He's a college graduate, considering grad school.
>
> I just - - my inclination, based on the information I was able to glean from him and his demeanor and the few questions he did ask, is that - - that he did answer is that he wouldn't necessarily be a good witness for the State in this particular case.

Green's counsel responded that Mr. Mitchell never said he could not be fair or that he could not be present. He argued that, while Mr. Mitchell might

28

not want to be at the trial, no one really wanted to be there. He further argued that Mr. Mitchell could probably get off work, and he saw no reason for the strike "other than the possible race bias." Ultimately, the trial court denied Green's *Batson* challenge, stating the following:

> I find that the reasons that were given by the State to be consistent with the observations of the Court. While he did give verbal responses that he could be fair and impartial, his body language was such that he only answered when specifically requested. He did not volunteer any responses on his own. With regard to the eye contact and his other body language was such that he was not comfortable, I find that to be sufficient for his being excused on a peremptory challenge.

In the above language, the trial court did weigh the State's reasons, finding them consistent with the court's own observations of Mr. Mitchell's non-verbal cues including lack of eye contact and negative body language, against Green's argument that Mr. Mitchell's verbal response was appropriate. *Alex* makes it clear that the burden of showing discriminatory intent in peremptory strikes is always on the one opposing the strike. It is clear from Green's response to the State's reasons at trial that Green did not show discriminatory intent on the part of the State. Green's mere use of the term "race bias" as a substitute for articulable examples showing how such bias was applied did not persuade the trial court, in whose purview such determination lies.

Green further contends that neither the State's reliance nor the trial court's comments on Mr. Mitchell's "body language" as a basis for a peremptory strike were sufficient. However, body language and the prosecutor's inclination in this case were buttressed by further reasoning articulated by the prosecutor. More specifically, in *Alex*, the Court stated that while "gut feelings" may factor into the prosecutor's reason to use a peremptory strike, "this reason, if taken alone, does

not constitute a race-neutral explanation." *Alex*, 951 So.2d at 153. Rather, "[w]hatever is causing the 'gut feeling' should be explained for proper evaluation of the proffered reason. *Batson* made it clear the neutral explanation must be one which is clear, reasonably specific, legitimate and related to the particular case at bar." *Id.* (citing *Batson*, 476 U.S. at 97-98).

Here, the prosecutor explained that Mr. Mitchell did not make eye contact with her and that he seemed "indifferent to the entire process." She mentioned his young age, that he was a college graduate working for Halliburton, making a good wage, and considering graduate school. She mentioned his overall demeanor and indicated that it was difficult to "glean" information from him. The trial court agreed and stated that his observations were the same. Both the trial court and the prosecutor indicated a dissatisfaction with Mr. Mitchell's brief, or closed responses. The totality of these reasons is clear and reasonably specific under *Batson* and *Alex*. Under *Snyder*, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder*, 552 U.S. at 476. "[T]hese determinations of credibility and demeanor lie 'peculiarly within a trial judge's province.'" *Id.*

Considering the above jurisprudence, the trial court did not commit clear error in finding that the State's reasons for excusing Mr. Mitchell were race-neutral.

Finally, Green points to the State's questioning of Mr. Mitchell during voir dire, arguing that the State made race an issue at that time. The record reveals, however, that the State's questioning of Mr. Mitchell, and all potential jurors, was

not a pre-text to hide racial bias. Rather, it was a direct question whose only purpose was to *eliminat*e the possibility of racial bias among the selected jury members, after Mr. Singleton made numerous comments indicating his own race and gender biases that would make it hard for him to find Green guilty.

More specifically, during voir dire, the prosecution asked Mr. Singleton whether he could look beyond sympathetic feelings for the families on either side and "just apply the facts to the law as presented and make a decision." Mr. Singleton, age fifty-three, provided a lengthy but honest answer indicating that he could not. He discussed being in court for a previous trial of a "young black guy that had robbed a store or a bank" and how sorry he felt for him and his grandmother. He discussed "being a black American" and placing blame when seeing "a black child get in trouble." He further stated that, "most black American kids lose their lives or they go to jail." He then discussed how hard it would be to judge a rape case because of watching flirtatious middle-school girls next door; and Mr. Singleton essentially placed himself in the shoes of Green stating that he too "could make that mistake." When asked if he could still be impartial in assessing the evidence as it was presented at trial, Mr. Singleton said, "it would be hard to say this man is guilty because today is not like it was" when Mr. Singleton was a teenager. He said kids are wild, don't dress properly, and they drink alcohol.

It was against this backdrop and in this context that the prosecutor questioned the next juror regarding his views of today's youth and later questioned Mr. Mitchell about whether he held views similar to Mr. Singleton. After asking Mr. Mitchell eight general questions about his background and education, many of which he answered in only one or two words, the following colloquy took place:

MS. HAWKINS:

31

You've sat quietly. I've talked about a lot of different things this morning in general. Do you have any particular issues here in this sort of a case?

PROSPECTIVE JUROR:

No, ma'am.

MS. HAWKINS:

Asked another way, I'm going to ask you another way. Based on everything I told you and the concerns expressed by some of the other jurors, any of those, do you feel you have any preconceived biases that would affect your ability to serve as a juror in this case?

PROSEPCTIVE JUROR:

No, ma'am.

MS. HAWKINS:

I'm just going to be frank, and a lot of prosecutors don't like to ask this question, but I think it's a fair question. Mr. Singleton stated that he had an issue because the defendant is African American. I'm African American, as are you. Does that pose any particular concern for you?

PROSPECTIVE JUROR:

Not at all.

Following her questions to Mr. Mitchell, the prosecutor asked all of the potential jurors whether anyone felt uncomfortable with sitting in judgment in this trial because of any racial issues or any other issues, previously covered or not, that they wanted to speak about as possibly affecting their ability to decide whether a crime had occurred. The prosecutor repeatedly stressed the importance of impartiality throughout voir dire. She also tailored her individual questions to each potential juror's background, including the individual's gender and employment duties. For example, when she questioned a mother with daughters, she asked

whether that person could be fair and impartial on that basis. She often used a previous juror's comments to open a dialogue with the next potential juror, such as the effect of crime television, once mentioned.

"The purpose of voir dire examination is to develop the prospective juror's state of mind not only to enable the trial judge to determine actual bias, but to enable counsel to exercise [her] intuitive judgment concerning the prospective jurors' possible bias or prejudice." *Alex*, 951 So.2d at 154. Under *Alex*, it is a party's *failure* to ask meaningful questions in voir dire that later exposes a sham justification for a peremptory strike. *Id.* Here, we find no record evidence of such pretext, ploy, or ruse on the part of the State and no clearly erroneous judgment on the part of the trial court in granting the State's peremptory strike of Mr. Mitchell.

### *Assignments of Error Nos. 3 And 4*

Green combines two assignments of error asserting that the trial court erred in denying his motion for new trial, and that his trial counsel's performance was ineffective. In fact, at the hearing on Green's motion for a new trial, Green combined his arguments for a new trial with his arguments of ineffective assistance of counsel. Green attempted to call former counsel as a witness in order to explore the issue. The State objected, arguing that ineffective assistance of counsel is usually argued at a post-conviction relief hearing, and if pursued during the new trial hearing, it could not be pursued again post-conviction. The trial court made it clear that it would not be done twice, but still did not allow Green to call his former counsel for testimony about his previous efforts. The hearing proceeded on the traditional grounds for granting a new trial, but the overriding argument continued to be ineffective assistance of counsel.

More specifically, Green argued that the "ends of justice" call for Green to receive a new trial based on the ineffectiveness of his trial counsel. Louisiana Code of Criminal Procedure Article 851(B)(5) provides for a new trial when "[t]he court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right." The standard for reviewing a motion for new trial on this ground is an abuse of discretion standard. *See State v. Guillory*, 10-1231 (La. 10/8/10), 45 So.3d 612. "Generally, a motion for new trial will be denied unless injustice has been done, no matter on what allegations it is grounded." *State v. Hollier*, 09-1084 (La.App. 3 Cir. 4/07/10), 37 So.3d 466, 475 (citations omitted). The trial court did not find that an injustice had been done where a jury of six unanimously found on the evidence presented that Green was guilty of simple rape.

Green further argued that McDonald's co-workers should have been interviewed and called as witnesses, as they would have confirmed that the victim and Green flirted with each other and were in a relationship, calling into question the credibility of the victim who denied flirting with, and being attracted to, Green. Green also asserted that his mother, Theresa Baldwin, should have been allowed to testify as she would have said that the victim did not appear intoxicated and did not have the demeanor of someone who had been raped. Seeking to have the recently obtained testimony of McDonald's co-worker Claude Rankins heard by the court, Green argued La.Code Crim.P. art. 851B)(3). It states that a new trial shall be granted if "[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty."

While Green argued that the evidence was not previously discoverable because McDonald's would not allow interviews with employees because of a pending lawsuit, it was pointed out that subpoenas could have been issued requiring the employees to talk. The trial court also questioned the relevancy of such witnesses since they were not with Green and the victim during the alleged rape. When the trial court asked defense counsel whether Green had even told his trial counsel about these witnesses and whether trial counsel refused to find the witnesses, defense counsel stated that he did not know. Defense counsel admitted that most of the employees either offered hearsay testimony or did not want to get involved. Ultimately, the trial court found that the information was previously discoverable and denied a new trial on that ground as well.

The trial court did however allow Green to proffer the testimony of Claud Rankins for purposes of post-conviction relief and appeal. Green's mother, Theresa Baldwin, was also allowed to proffer her testimony. These two witnesses underwent sworn examination and cross-examination the following day, in an empty courtroom outside the presence of the trial judge.

Appellate counsel for Green does not expend argument on new evidence under La.Code Crim.P. art. 851(B)(3), perhaps realizing that an ineffective counsel argument runs counter to an argument that that same counsel exercised due diligence in finding co-worker testimony that would have favored his client. We agree with the trial court that co-worker testimony was available and discoverable before and during trial through the normal subpoena and discovery processes. On appeal, Green's overriding argument is that, but for ineffective assistance of counsel, co-worker testimony would have provided crucial information to the jury about the credibility of the victim, and the ends of justice,

35

pursuant to La.Code Crim.P. art. 851(B)(5), requires that a new trial be granted and the omitted testimony be presented. We again agree with the trial court that no injustice was done where a jury unanimously found under the evidence presented that the seventeen-year-old victim did not consent to having sex with the defendant, and the State proved the elements of simple rape at trial.

What we must now decide is whether the record, with the proffered testimony, is sufficient to decide the issue of ineffective assistance of counsel. This court has stated the following about the standard for proving ineffective assistance of counsel:

> "The standard of review on a claim of ineffective assistance of counsel is deficiency in counsel's performance giving rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

> A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La.Const. art. I, § 13. To establish a claim for ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect.

> A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate.

*State v. Nargo*, 15-779, pp. 7-8 (La.App. 3 Cir. 6/1/16), 193 So.3d 1263, 1268 (citations omitted).

36

Here, the trial court did not decide the ineffectiveness issue or allow Green to call his former counsel to testify regarding his efforts at trial. However, because Green indicated that Claude Rankins was the only co-worker whose testimony the defense could "lock down," and because the defense was allowed to proffer that testimony and the testimony of Theresa Baldwin, we find the record sufficiently complete to resolve the second prong of the issue, whether Green was *prejudiced* by ineffective assistance of counsel.

More specifically, under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), for a defendant to establish that he received ineffective assistance of counsel, he must show that (1) "counsel's representation fell below an objective standard of reasonableness" and that (2) "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id*. at 687-88. If the defendant fails to meet one of the criteria of the two-pronged test, the reviewing court is not required to address the other one. *State v. James*, 95-962 (La.App. 3 Cir. 2/14/96), 670 So.2d 461 (citing *State v. James*, 555 So.2d 519 (La.App. 4 Cir.1989), *writ denied*, 559 So.2d 1374 (La.1990)). "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the [second] ground of lack of sufficient prejudice, which [] will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

Here, pursuant to the proffer, Claude Rankins, age forty-five, testified that he was an employee of McDonald's and knew both Green and the victim. He described the relationship between Green and the victim in October of 2009 as "flirting with each other" and "probably dating." However, he admitted that he never saw them together outside of the work environment, nor did he socialize

37

with either of them outside of work. Mr. Rankins was of the belief that the victim consented to having sex with Green. He admitted, however, that he was not present on the night in question.

Also pursuant to the proffer, Green's mother, Theresa Baldwin, testified that trial counsel visited her son in jail only once prior to trial. She also stated, however, that when they wanted to get rid of counsel, he just kept coming. She said that she talked to counsel many times and wanted to testify, but trial counsel did not believe she should, reasoning that it may "reflect on [Green's] past." When asked what she would have said if allowed to testify, Ms. Baldwin stated she would have said that the victim and the victim's father were lying. According to Ms. Baldwin, the victim did not look intoxicated on the night in question, nor did she look scared. Ms. Baldwin also testified that when they met up with the victim's father, the victim's father thanked Green for bringing the victim home, and the victim's father seemed to be mad at the victim, not at Green.

We find that this testimony fails to show that Green was prejudiced by his attorney's omission of such testimony, as this evidence has no bearing on whether a rape took place and would not have affected the evidence of rape presented to the jury. Rankins stated that he thought that S.M. and Green were in a relationship because they flirted at work. Even if there was flirting, S.M.'s "flirting" with Green at work does not mean that she consented to having sex with him. And Baldwin's testimony would have been contradicted not only through the testimonies of the victim herself, her parents, and Detective Abshire, but also by the victim's blood alcohol level of .08/.09%, and the objective medical findings of bruising and tearing. Additionally, Baldwin was unaware that her son confessed to giving alcohol to the minor, and her testimony would not likely have helped Green

at trial. None of this testimony would have contradicted S.M.'s testimony regarding the rape; none of this testimony concerns the elements of the crime; and none of this testimony overcomes the objective evidence of simple rape under La.R.S. 14:43.

### *Assignment of Error No. 5*

In his final assignment of error, Green contends that the maximum sentence imposed by the trial court is excessive. Green was convicted of a simple rape that occurred on or about November 1, 2009, a violation of La.R.S. 14:43. At the time the offense was committed, the penalty for simple rape was imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than twenty-five years. La.R.S. 14:43. The trial court sentenced Green to the maximum sentence of twenty-five years at hard labor, without benefit of probation, parole, or suspension of sentence.

Appellate counsel alleges that the counsel representing Green at sentencing was ineffective for failing to file a motion to reconsider sentence. The record reflects that a pro se Motion for Reconsideration of Sentence was filed on January 28, 2015, and was denied as untimely.[4] After sentence was imposed, the trial court asked defense counsel if he objected to the trial court's ruling, to which defense counsel responded, "Yes." No specific grounds were alleged.

Green asserts that defense counsel's failure to raise a specific ground in either an objection or in a motion to reconsider sentence limits Green to a bare claim of excessiveness. La.Code Crim.P. art. 881.1(E); *State v. Blunt*, 16-220 (La.App. 3 Cir. 9/28/16), 201 So.3d 358. Green contends that the counsel at

---

[4]Defendant also filed a pro se request for resentencing, which was denied as untimely on June 28, 2012.

39

sentencing was ineffective for failing to raise the following claims in a motion to reconsider sentence:

> Additionally, counsel representing Appellant at sentencing erred in failing to file a motion to reconsider following the imposition of a maximum sentence. The court noted certain factors at sentencing that were either misleading or based on insufficient information which should have been more thoroughly addressed. Failure to file this motion limits Appellant's sentencing review to a bare bones claim of excessive sentence, to his prejudice. Counsel should have sought reconsideration and addressed the issue of Appellant's laughter during sentencing, the court's consideration of incorrect or unsubstantiated facts and the excessiveness of the sentence.

As previously discussed, ineffective assistance of counsel claims are usually raised in an application for post-conviction relief, but may be addressed on appeal when the record is sufficient to review them. *Nargo*, 193 So.3d at 1268. Additionally, a claim of ineffective assistance of counsel at sentencing is not cognizable on collateral review when the sentence imposed is within the authorized range of the sentencing statutes. *State v. Thomas*, 08-2912 (La. 10/16/09), 19 So.3d 466. Because the record is sufficient to review Green's ineffective assistance of counsel claim as to his counsel's failure to file a motion to reconsider sentence, and because Green is precluded from raising the claim on post-conviction, we will address the claim.

In *State v. Parker*, 16-1016 (La.App. 1 Cir. 2/17/17) (unpublished opinion),[5] the first circuit stated the following regarding an ineffective assistance of counsel claim for failure to file a motion to reconsider sentence:

> Louisiana Code of Criminal Procedure article 881.1(E) provides that the failure to make or file a motion to reconsider sentence precludes a defendant from raising

---

[5]This case is cited at 2017 WL 658256.

40

an excessive sentence argument on appeal. . . . In the interest of judicial economy, however, we will consider the defendant's excessive sentence argument, even without a motion to reconsider sentence, to address his claim of ineffective assistance of counsel. Failure to file a motion to reconsider sentence in itself does not constitute ineffective assistance of counsel. Nevertheless, if the defendant can show a reasonable probability that, but for counsel's error, his sentence would have been different, a basis for an ineffective assistance claim may be found.

*Parker*, 16-1016 at p. 21 (citations omitted).

The court in *Parker* proceeded with an excessive sentence review and ultimately found that the defendant failed to show a reasonable probability that his sentence would have been different had his trial counsel filed a motion to reconsider sentence. Following this same framework, we will first review Green's sentence for excessiveness.

The law is well settled concerning the standard to be used in reviewing excessive sentence claims:

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

. . . [E]ven when a sentence falls within the statutory sentencing range, it still may be unconstitutionally excessive, and in determining whether a sentence shocks the sense of justice or makes no meaningful contribution

41

to acceptable penal goals, this court has suggested that several factors may be considered:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Decuir*, 10-1112, pp. 11-13 (La.App. 3 Cir. 4/6/11), 61 So.3d 782, 790-91 (citations omitted).

Here, Green received the maximum sentence for the offense of simple rape. "[M]aximum sentences are generally reserved for the worst offenders and the worst offenses." *State v. Fallon,* 15-1116, p. 6 (La.App. 3 Cir. 4/6/16), 189 So.3d 605, 609. At the sentencing hearing, the trial court noted that Green was a 49-year-old male. The State noted that simple rape is an enumerated crime of violence and that Green is a second time violent offender and sexual offender. Green was convicted in 1979 of one count of attempted aggravated rape and one count of aggravated burglary, for which he was sentenced to concurrent sentences of thirty-five years and ten years, respectively. Here, the State requested the maximum sentence, noting that the victim was seventeen at the time of the offense and that Green was at least thirty years older than she was. The State argued that Green's prior sexual history along with the age difference suggested that Green took advantage of someone who was extremely vulnerable.

After the victim's mother made a statement to the court, the State asked the trial court to take note of the fact that Green laughed during the mother's statement. The State gave the following additional facts regarding Green's criminal history:

> I know a PSI was not ordered, Your Honor. But, I do show that when he was released he was paroled in 1993 on that initial attempted aggravated rape charge and burglary charge, aggravated burglary charge, Your Honor. He was arrested for molestation of a juvenile in Baton Rouge, April the 9th of 1994, two counts. The State has no indication that he was actually convicted. I believe he pled to a misdemeanor offense, is my understanding, as a result of that charge.
>
> In 1999 he was arrested for operating a vehicle while intoxicated. And, in 2000 he was arrested in Lake Charles. These last two incidents, '99 and 2000, in Lake Charles for aggravated assault with a firearm and resisting or interference in obstruction - - obstruction to a police offender.
>
> Your Honor, he was - - his parole was ultimately revoked and he did resume - - have to go back to jail to complete his sentence. So, I just want the Court to be aware of the full take of who this individual is, even though he -- his attorney has tried to argue in the late motions that were filed, and unartfully I would add, that this was an innocent man. He was convicted by a unanimous - - unanimously by a six-person jury of this crime.
>
> His behavior after the initial egregious offense in 1979, the continued involvement in crimes involving sex offenses against young persons is telling, and should be considered by the Court.
>
> And, with that, again, the State would ask that the maximum imposition of 25 years without probation, parole or suspension of sentence at hard labor be imposed.

In response, defense counsel stated that the conviction was a tremendous miscarriage of justice; that Green did not rape the victim; and that the

43

victim had sued McDonald's and had a profit motive. He again argued that prior counsel had failed to investigate or properly represent Green at trial.

The trial court allowed Green to give a statement, warning him to not rehash the facts of the case. Green began his statement with the following:

> I would like to say that I could never apologize to this person for something that isn't true. So, I'm amazed they got on the witness stand and lied repeatedly, especially about she woke up and I was on top of her. It's so far from the truth it's somewhat amusing to me.
>
> If I was a woman and I woke up with somebody I trusted and thought cared about my well-being, and was having sex with me against my will, I would have been highly upset emotionally, and extremely hurt. I would have gotten out of that apartment quick as I could and let someone know. I definitely wouldn't let this person take me home. If [S.M.] testified that she was scared or she- -

The State objected, and the trial court stopped Green from continuing to read the letter but allowed Green's letter to be filed into the record along with numerous other letters the trial court had received from Green. Defense counsel informed the court that it had no mitigating argument since his goal was to win the appeal based on Green's innocence. Before imposing sentence, the trial court reviewed the factors set forth in La.Code Crim.P. art. 894.1. First, the trial court noted there was an undue risk Green would commit another offense since he had previously been convicted of a crime of violence and a sex offense. Second, the trial court noted that based on Green's history and the facts surrounding the offense, a lesser sentence would deprecate the seriousness of the offense. As for aggravating factors, the trial court noted the factors he deemed significant:

> 1) That the offender's conduct during the commission of the offense manifested deliberate cruelty to the victim. As indicated, this is designated as a crime of violence. It's a physical assault on the victim's body,

44

as well as there were mental injuries that have been established.

2) The offender knew or should have known that the victim of the offense was particularly vulnerable or incapable to resistance due to extreme youth, advanced age, disability or health.

In this situation evidence established that the victim had passed out from alcohol. And, at that point the offender should have known that they were vulnerable, and took advantage of that situation.

The offender used his or her position or status to facilitate the commission of the offense.

It's noted that he was a coworker, offered her alcohol, and then more after the work shift ended, as well as requested a ride home from the victim.

The offender has - - it says, "used threats or actual violence in the commission of the offense."

As previously indicated, this is a designated crime of violence under the Louisiana Code of Criminal Procedure, and the Court finds that that would be an aggravating matter, as well as physical evidence also established that there were medical injuries associated with the attack of the victim.

The offense has resulted in significant permanent injuries or significant economic losses to the victim or their family.

As indicated, and specifically, again revisited today that the victim's family has been traumatized by the incident, as well as the victim herself.

It is noted that the offender has been previously involved in sex offenses in the past. Other aggravating circumstances in conjunction with that is that the defendant has, in fact, had a prior conviction for a sexual assault on an elderly individual, based on the facts of that individual case, and now on a 17-year-old victim by the facts of this case.

In looking at mitigating circumstances, the defendant having no history of prior delinquency or

criminal activity, that is much more aggravating than mitigating based on the history that's before us today.

The criminal conduct, is it likely to reoccur or not? Again, more aggravating than mitigating. Actions speak louder than words.

And, is the defendant likely to respond to probationary treatment? Unavailable in this situation.

The trial court then went over the sexual offender registration requirements with Green. To conclude its reasons for the sentence imposed, the trial court stated:

At this time the defendant has been found guilty of the charge of simple rape by a jury, a violation of 14:43. As reviewed by the history of the defendant, it is found that he has in fact preyed on both the elderly and now the young. It is the Court's position that Mr. Robert Green is a sexual predator, and as such it is the Court's position that he will be ordered to serve 25 years at hard labor, said sentence to run without benefit of probation, parole or suspension of sentence.

The trial court explained to Green that under La.R.S. 15:571.3, his sentence is not subject to diminution for good behavior. Finally, the trial court stated the following regarding Green's conduct in court:

I would also note for the record I do find that very disturbing and telling, Mr. Green, the lack of remorse and the actions taken during the course of a victim's statement. That further confirms my issue that you should not be free, that you do pose a threat to society.

Green contends that the trial court abused its discretion in imposing the maximum sentence because the prior offense of attempted aggravated rape occurred thirty-one years earlier when Green was seventeen years old. He further contends that the judge commented that Green used his position as a co-worker to facilitate the crime, even though Green had no authority over S.M. at their place of employment. He further argues that the judge commented that Green "[u]sed

46

threats or actual violence in the commission of the offense," with no evidence to support this conclusion. He argues that while S.M. had redness and light bruising, there was no suggestion as to how or when these occurred, and that the State's theory of the case was not that threats or force were used, but that S.M. was too drunk to consent.

As discussed in the review of the evidence for sufficiency, there was evidence that the victim's bruises occurred during the present offense. The victim had several bruises which the SANE nurse described as "newer" because of their coloring. When the victim was asked if she knew how she got the bruises, she could only account for one being attributed to basketball. The others, she testified, were not there when she went to work on the day of the offense. The nurse also noted injuries to the victim's vaginal area that were consistent with sexual assault.

Green further notes that the trial court did not allow Green to read his seven-page letter in court. Additionally, Green asserts that he wrote another letter to the court explaining the reason he laughed when the victim's mother was speaking. Green also questions whether the trial court relied upon incorrect information when sentencing him. Attached to Green's brief is a letter dated October 12, 2011, from the Department of Public Safety and Corrections to the sentencing judge. The letter states:

> In accordance with La. R.S. 15:560.2 et seq., the Louisiana Sex Offender Assessment Panel (SOAP) previously referred to this Honorable Court a recommendation that the above referenced offender be designated a Sexually Violent Predator (SVP).
>
> After further review and re-evaluation, the Panel respectfully rescinds and withdraws its earlier recommendation. As such, the Department of Public Safety and Corrections requests that no hearing be scheduled in this matter.

47

Green asserts that it is uncertain whether the trial judge's conclusion that Green was a sexual predator was based on a report by SOAP that was, as indicated in the letter above, rescinded shortly after sentencing. The State discounts the importance of the letter, noting there is no indication in the record that the trial court was aware of SOAP's original finding and noting that the trial court based its finding on Green's criminal history of preying on the elderly and now the young. We agree with the State that the above letter does not call for resentencing. There is no indication that the trial court relied upon SOAP's original decision at sentencing. Furthermore, if the trial court had received the original determination by SOAP that Green was a sexually violent predator, the trial court was required to schedule a hearing to review the recommendation pursuant to La.R.S. 15:560.2. If the trial court found by clear and convincing evidence that Green was a sexually violent predator or a child sexual predator, Green would have had to comply with the lifetime registration and notification requirements set forth in La.R.S. 15:560.3, et sequitur. Thus, the purpose of SOAP's finding was not to affect the trial court's sentence of Green, and there is no indication in the record that it influenced the trial court in sentencing Green.

Finally, Green cites several cases where fifteen-year sentences were imposed for simple rape. *See State v. Cleveland*, 12-163 (La.App. 4 Cir. 4/10/13), 115 So.3d 578, *writ denied*, 13-926 (La. 11/8/13), 125 So.3d 444; *State v. Greenwalt*, 41,145 (La.App. 2 Cir. 8/23/06), 938 So.2d 1073; and *State v. Williams*, 05-673 (La.App. 5 Cir. 3/14/06), 926 So.2d 665, *writ denied*, 06-870 (La. 10/13/06), 939 So.2d 360.

After restating Green's criminal history, the State notes that Green committed the present offense less than one year after being released from prison as a result of a parole violation. As for Green's argument that the trial court failed to consider that his previous conviction for attempted aggravated rape occurred thirty-one years prior to the present offense and when Green was seventeen years old, the State asserts:

> The fact the crime happened so long ago is irrelevant considering that this defendant was arrested for molestation of a juvenile the year following his release from his 1979 attempted aggravated rape conviction, that he has been in and out of jail since his release, and the instant offense occurred within 1 year of his release. The defendant is not a first time felony offender whose last crime was years ago; he has continuously been in violation of the law.

As for Green's argument that the trial court erroneously found that Green was in a position of authority over the victim, the State contends that the trial court was merely stating the facts of the case—i.e., that Green was a coworker who offered the victim alcohol and requested a ride home—rather than making a finding as to authority. Additionally, the State contends that Green used his position as the victim's coworker to facilitate the offense. Addressing Green's argument that the trial court erred in stating that Green used threats or violence when the simple rape was based on the victim's "stupor," the State asserts that the trial court properly noted that the victim was found with bruises she did not have before she left with Green. The record supports the State's assertions.

A similar case upholding the maximum sentence is *State v. Fruge*, 14-1172 (La. 10/14/15), 179 So.3d 579. There, the supreme court reversed this court's finding that the maximum sentence for *simple* rape (twenty-five years without benefits) was excessive. This court had remanded with instructions for the

49

trial court to impose a mid-range sentence to run concurrently with Fruge's other sentence for *forcible* rape. *State v. Fruge*, 13-1386 (La.App. 3 Cir. 5/7/14), 139 So.3d 602. Fruge had met both victims in social settings where the women consumed alcohol and/or drugs and later passed out or fell asleep; the rapes occurred during the periods of incapacity; and Fruge had no history of felony arrests or convictions. *Id.* at 604. This court noted two simple rape cases where only 15-year sentences were imposed and found that Fruge's record did not support a worst offender status or the imposition of the maximum sentence.

The supreme court reversed this court's finding of excessiveness. The supreme court recognized that a comparison of Fruge's sentence to sentences imposed for similar crimes raised questions as to the appropriateness of the maximum sentence. *Fruge*, 179 So.3d at 584. Despite this concern, the supreme court stated that while a comparison of similar cases may provide some insight, the sentences must be individualized as to the particular offender and offense. *Id.* The supreme court also stressed the discretion that must be afforded the trial court:

> It is within the purview of the district court to particularize the sentence because the district court "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." The district court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of discretion by the trial court. Therefore, the only relevant question on review is "whether the [district] court abused its broad sentencing discretion, not whether another sentence might have been more appropriate."

*Id.* (citations omitted).

The supreme court noted that an important consideration was the fact that the trial court ordered Fruge's simple rape sentence to run concurrently with

50

his forcible rape sentence, and that consecutive sentences would ordinarily be appropriate since the rapes were not part of the same act or transaction. However, the supreme court assumed that because Fruge was a first-time felony offender, the trial court believed the imposition of concurrent sentences was proper. *Id.* at 584-85. The supreme court concluded its discussion by stating the following:

> The crime of simple rape presupposes that the defendant has taken advantage of the victim's abnormal state of mind induced by intoxication or any other cause. *See* La.R.S. 14:43(A). That a defendant may have taken advantage of an unconscious or sleeping victim alone does not place him among the most blameworthy of offenders committing the crime of simple rape. Nevertheless, the evidence related to the similar sexual assaults in this case shows that this defendant has engaged in a pattern of preying on young, incapacitated women, a factor the district court was free to consider in rendering the sentences in this case. Considering defendant's 2006 rape of J.H. in the context of his behavior over an extended period of time, rather than in isolation, we are unable to find that the district court manifestly abused its broad sentencing discretion by imposing the maximum term of imprisonment for the rape of J.H., particularly since the district court would have been justified in ordering consecutive sentences in this case . . . .

*Id.* at 585-86 (footnotes omitted).

The present case differs from *Fruge* in that Green did not receive a benefit like the imposition of a concurrent sentence. However, the facts of the present case are more egregious. The victim in the present case was younger (age seventeen) than the victim of the simple rape in *Fruge* (age twenty), and Green in the present case was older (age forty-seven) than Fruge (age thirty-two). *See Fruge*, 139 So.3d at 605, 607. Additionally, Green has a prior felony history whereas Fruge had a couple of misdemeanors but no history of felonies. *Id.* In view of the supreme court's decision in *Fruge*, Green's sentence is not excessive.

The State cites *State v. Despanie*, 06-1269 (La.App. 3 Cir. 2/7/07), 949 So.2d 1260, which upheld the maximum sentence for simple rape. Despanie was originally charged with aggravated rape and pled no contest to simple rape. He was a first-time felony offender who worked as a certified nursing assistant at a long-term care facility. *Id.* Despanie, nineteen, was observed having sex with a ninety-two-year-old female resident suffering from dementia. Upholding the maximum sentence, this court noted that Despanie's credibility was seriously called into question and that he received a significant benefit from his plea bargain. *Id.* Here, while Green did not receive a benefit from a plea bargain, Green has a felony history that Despanie did not have.

Considering the facts of the present case in light of *Fruge* and *Despanie*, the maximum sentence imposed is not excessive. Additionally, considering the detailed reasons given by the trial court in the present case, it is not probable that a motion to reconsider sentence alleging the assertions made by Green would have caused the trial court to impose a lesser sentence. Accordingly, there is no merit to Green's assignment of error alleging excessive sentence and no merit to Green's claim that his counsel was ineffective for failing to file a motion to reconsider sentence.

V.

**CONCLUSION**

Based upon the foregoing, the jury's conviction and the trial court's sentence are affirmed in all respects.

**CONVICTION AND SENTENCE AFFIRMED**.